RICHARD SNELL, Appellee, *vs.* LINCOLN H. WELDON, Exr., Appellant.

*Opinion filed February 16, 1910.*

1. PLEADING—*jurisdiction of court to permit an amendment of pleadings on remandment before notice of re-instatement.* Where a chancery cause is remanded and the remanding order is filed in the trial court the court has jurisdiction to permit formal amendments to the bill, even though the ten-day notice of re-instatement of the cause, required by section 113 of the Practice act, has not been served. (*Austin* v. *Dufour*, 110 Ill. 85, explained.)

2. PARTIES—*when adding necessary party to a bill to contest will is not the beginning of a new suit.* Where all the necessary parties in being at the time a bill to contest a will is filed are made parties the court has jurisdiction of the proceeding, and the addition of another necessary party, born after the filing of the bill, after the one year limitation for filing such bills has expired, is not the commencement of a new suit, such as deprives the court of jurisdiction.

3. WILLS—*when it is not necessary for evidence to sustain all charges of the bill.* Where a bill to contest a will is predicated upon the three distinct grounds of general want of testamentary capacity, undue influence and the existence of an insane delusion, it is not necessary that the evidence shall sustain all of the charges, and if it is sufficient to sustain any of the grounds so alleged the will should be set aside.

4. SAME—*general definition of insane delusion.* In general, an insane delusion may be said to exist where a testator, without evidence of any kind, imagines or conceives something to exist which does not, in fact, exist, and which no rational person would, in the absence of evidence, believe to exist.

5. SAME—*belief in existence of facts based upon some evidence is not an insane delusion.* If a testator has some actual grounds for the belief which he has, though they are regarded by others as wholly insufficient, his mere misapprehension of the facts or his unreasonable and extravagant conclusions drawn therefrom do not establish such a delusion as will invalidate the will.

6. SAME—*when injustice, unfairness, prejudice and unreasonable anger afford evidence of mental derangement.* While injustice, unfairness, prejudice and anger without reasonable cause do not disqualify a person from making a valid will, still where such manifestations habitually appear in respect to the same subject

without any reason and are adhered to after their falsity is demonstrated they become strong evidence of mental derangement, and evidence of their existence, without cause, in respect to an only son is of more weight than if the parties were not closely related.

7. SAME—*what evidence tends to establish an insane delusion.* Proof that the testator believed certain things concerning his only surviving son; that he had no evidence on which to base this belief; that the things he believed were such things as no rational person would believe without evidence, and that he refused to give up his belief in the face of such reasonable evidence as would convince any person of sound mind that it was unfounded, tends to establish an insane delusion.

8. SAME—*when jury may consider apparent inequality of distribution.* The apparent inequality and unreasonableness of the distribution of a vast estate by a will which practically disinherits the testator's only son may be considered by the jury upon the question of the testator's testamentary capacity, in connection with other evidence upon that question.

9. INSTRUCTIONS—*the fact that hypothetical facts may not be proven by weight of evidence is no objection.* If the facts stated hypothetically in an instruction presenting the contestant's theory upon one point in a will case have a basis in the evidence, which is conflicting upon that point, the fact that the proponents contend the weight of the evidence tends to show the facts were not as hypothetically stated is not a valid objection to the instruction.

10. SAME—*"subjects" of a testator's bounty may include devisees.* Under the issues made in this case and in view of the context of the instructions complained of, the words "subjects connected with the testamentary disposition of his property," used in such instructions, mean any person, matter or thing connected with the testamentary disposition of the testator's property, and include devisees as well as the things devised.

CARTWRIGHT, HAND and DUNN, JJ., dissenting.

APPEAL from the Circuit Court of DeWitt county; the Hon. SOLON PHILBRICK, Judge, presiding.

HERRICK & HERRICK, and BARRY & MORRISSEY, for appellant.

JOHN FULLER, EDWARD J. SWEENEY, W. S. KENYON, LEMON & LEMON, and INGHAM & INGHAM, for appellee.

2 4 3 — 3 2

Mr. JUSTICE VICKERS delivered the opinion of the court:

Richard Snell filed a bill in chancery in the DeWitt county circuit court to have the will of his father, Thomas Snell, set aside on the grounds that the testator was not of sound mind and memory, was unduly influenced to make said will and had insane delusions regarding complainant.

The case has been tried in the circuit court by three different juries. On the first trial of the cause the jury failed to agree and were discharged without a verdict. On the second trial there was a finding for the complainant, and against the will, on all of the issues presented. A decree was entered in accordance with the verdict setting aside the will, from which the executor appealed to this court. The decree of the circuit court was reversed because of several errors which are pointed out in the opinion of this court, which is reported as *Snell* v. *Weldon,* 239 Ill. 279. After the remanding order of this court was filed in the circuit court, but before any notice had been given to appellant that the cause would be re-docketed for trial, an application was made to one of the circuit judges, in vacation, for leave to amend the bill, making a child that had been born to the testator's grandson, Harry C. Snell, after the commencement of the suit, a party defendant. This leave was granted and the child was made a party and brought into court by summons, and the child answered the bill through a guardian *ad litem.* Upon the third trial of the cause a verdict was returned finding that the alleged will, and each of the three codicils thereto, purporting to be the last will and testament of Thomas Snell, were not his last will and testament, and specifically finding that at the time when the will and the several codicils thereto were executed the testator was laboring under an insane delusion concerning his son, Richard Snell. The circuit court entered a decree setting aside the will, after having overruled motions to set aside the general and special verdicts and for a new trial. The executor has again

brought the record to this court for review and asks a reversal for several reasons, which will be hereinafter considered.

When this cause was before this court on the previous hearing the circumstances attending the execution of the will were stated, but in view of the issues then presented and the conclusion reached by this court in respect thereto we did not deem it necessary to set out the will and the three codicils at large, but as the case is now presented it is necessary to a proper discussion and understanding of the questions involved to set out the entire will and the three codicils thereto. Before doing so a few of the leading facts will be stated.

The testator was born in December, 1818, and died June 19, 1907, at the age of eighty-eight years. He had lived the greater part of his life in DeWitt county. He had been exceptionally successful in accumulating a large fortune, and at the time of his death his estate was valued at approximately $1,500,000, which consisted largely of valuable real estate in McLean and DeWitt counties, in this State, and lands in Iowa and Missouri. At the time of his death he left one child, Richard Snell, the appellee herein, and three grandchildren, Thomas Thornton Snell, Harry C. Snell and Lena E. Dinsmore, children of his deceased son, James Thornton Snell, as his only heirs-at-law. The testator's wife died many years before the will was executed. Other facts and circumstances which have a bearing upon the issue in regard to the existence of an insane delusion in the mind of the testator will be stated hereinafter in connection with the consideration of that question.

The will of Thomas Snell is as follows:

"I, Thomas Snell, of the county of DeWitt and State of Illinois, do make, publish and declare this to be my last will and testament, hereby revoking all former wills by me made at any time.

"1. I give, bequeath and devise all my property, real and personal, wherever the same may be, to Lincoln H. Weldon and his successor or successors, in trust for the uses and purposes herein expressed and specified, until the time hereinafter named for the final distribution of my estate.

"2. It shall be the duty of said Lincoln H. Weldon (who is also hereinafter named as the executor of this my will) to pay my funeral expenses and all my just debts in due course of administration, and in case a contract for building a vault or tomb for myself and family, now in contemplation, is not let or made before my decease, I hereby authorize, direct and require the said trustee to let or make such contract within six (6) months from my decease, the contract price to be not less than seven thousand ($7000) dollars and not more than ten thousand ($10,000) dollars. It shall be the duty of said trustee, and each and every trustee for the time being under this will, to keep my burial vault and cemetery lots in good repair and order, the grounds in blue grass and suitable flowers at the proper seasons.

"3. I authorize and direct the said trustee, his successor or successors in trust, to pay annually to my daughter-in-law, Hannah A. Snell, the sum of one thousand ($1000) dollars on the first day of January of each and every year, so long as she shall live, in accordance with contract with her dated on or about the 25th day of July, A. D. 1899.

"4. I authorize and direct the said trustee, his successor or successors in trust, to pay annually in the month of March in each and every year after the year of my decease, the following annuities to the persons named below, as follows: To my brother, Joseph Snell, annually, so long as he may live, the sum of four hundred ($400) dollars; to Mrs. Clara Belle DeLand, annually, so long as she may live, the sum of four hundred ($400) dollars; to my great-niece, Mabelle Snell, the daughter of my nephew,

Thomas Snell, annually, so long as she may live, the sum of four hundred ($400) dollars.

"5. I authorize and direct the said trustee, his successor or successors in trust, to pay annually to my son, Richard Snell, the sum of one thousand ($1000) dollars in the month of March of each and every year after the year of my decease, so long as he shall live; provided that no such annual payment shall be made prior to 1905.

"6. I authorize and direct the said trustee, his successor or successors in trust, to pay annually the sum of one thousand ($1000) dollars to each of my three grandchildren, Lena E. Dinsmore, Thomas Thornton Snell and Harry C. Snell, in the month of March in each and every year after my decease, until improvements in East Fort Dodge, Iowa, to the amount of one hundred and fifty thousand ($150,000) dollars, as hereinafter directed, have been made and paid for.

"7. I authorize and direct the said trustee, his successor or successors in trust, to pay annually the sum of three thousand ($3000) dollars to each of my three grandchildren, Lena E. Dinsmore, Thomas Thornton Snell and Harry C. Snell, in the month of March in each and every year, for the period of five (5) years next after said improvements in East Fort Dodge, Iowa, to the amount of one hundred and fifty thousand ($150,000) dollars have been made and paid for; provided that in case any business house or houses of considerable value should during said period of five (5) years be destroyed by fire, it shall be the duty of said trustee, his successor or successors, to rebuild the same, and until this is done and the same paid for, the annual payments to each of said three grandchildren shall be reduced to the sum of one thousand ($1000) dollars.

"8. It shall be the duty of said trustee, his successor or successors in trust, to pay promptly all taxes and assessments on said property, to keep all business houses rea-

sonably insured, and to keep all the real property belonging to said trust estate (except vacant lots) well rented for cash, but not for more than five (5) years in any one term, except property used for hotel or bank business, which may be rented for not exceeding ten (10) years in any one term.

"9. I hereby authorize, empower and direct said trustee, his successor or successors in trust, from time to time within four (4) years from my decease, to expend from my personal property, from the rents and profits of my lands and tenements, and from the proceeds of the sales of such of my real property as hereinafter authorized to be sold, moneys to the amount of one hundred and fifty thousand ($150,000) dollars in erecting business houses and making improvements in blocks nine (9), ten (10) and eleven (11) in East Fort Dodge, Iowa, on my lots fronting on Central avenue, once called Market street. The business houses must be of stone or brick, or partly of each, and in other respects the character and style of the buildings and improvements are to be determined by the trustee and my said three grandchildren, or, if they do not all agree, by the trustee with the written consent of any of my said grandchildren. I direct that these buildings and improvements shall be erected and made as soon as is reasonably practical after my decease, due regard and care being had and taken for the regular payment of the special sums of money and legacies provided for and directed to be paid by this will. But should I, myself, erect buildings and make improvements on said lots in East Fort Dodge, Iowa, the said trustee shall be required to erect buildings and make improvements on said lots only to the amount of the difference between the cost of the buildings erected and the improvements made by me and the sum of one hundred and fifty thousand ($150,000) dollars.

"10. I hereby further authorize and empower the said trustee, his successor or successors in trust, with the writ-

ten consent of my said three grandchildren or any one of them, from time to time within the period of five (5) years next after said improvements in East Fort Dodge, Iowa, to the amount of one hundred and fifty thousand ($150,-000) dollars, have been made and paid for, to expend from the rents and profits of said trust property and the proceeds of the sales of such portions thereof as are hereinafter authorized to be sold, the further sum of one hundred thousand ($100,000) dollars in erecting such buildings and making such improvements on any of the lands and tenements held in trust under this will as they, or any one of them, may agree upon with the trustee, provided this may be done without delaying the regular payment of the special sums of money and legacies as provided for and directed by this will.

"11. In order to raise money when needed for any improvements herein directed or authorized or other purposes of said trust, I hereby authorize and empower said trustee, his successor or successors in trust, to sell any promissory notes belonging to said trust estate, whether due or not due, at their face value or then present worth, and to transfer any of them as collateral security.

"12. I hereby authorize and empower said trustee, and any trustee for the time being acting under this will, to raise, by mortgage or mortgages, any sum or sums of money which he, with the written consent of at least one of said three grandchildren, shall think necessary or expedient to expend in the erection of buildings, the changing of their style and making new improvements on any real property belonging to said trust estate. But the total amount of such sums of money at any one time shall not exceed fifty thousand ($50,000) dollars, and every such mortgage shall be given only on the real property to be improved, and shall be made to mature at not more than five (5) years from the date. And the property to be thus built upon, changed or improved, and the character and

style thereof, are to be determined by said trustee, with the written consent of at least one of my said three grandchildren.

"13. I hereby authorize and empower said trustee, his successor or successors in trust, to sell and convey all my lots in the city of Chicago, Illinois; in El Paso, Woodford county, Illinois; in Aurora, Kane county, Illinois; in White Heath, Piatt county, Illinois; in the town of Weldon, DeWitt county, Illinois, and in blocks and lots and what is called the border property in or adjoining the town of Weldon; and also all my lands in Putnam county, Missouri, in Sioux county, Iowa, in Hancock county, Iowa, in Boone county, Iowa; and also all my lands and lots in and adjoining East Fort Dodge, Iowa, except all my lots in blocks nine (9), ten (10), eleven (11), thirteen (13) and twenty (20) in said East Fort Dodge, Iowa. Each and every one of such sales shall be made for one-fourth (¼) cash down, and the balance in equal installments in one (1), two (2) and three (3) years, respectively, with interest and mortgage on the property sold.

"14. I do hereby authorize and empower said trustee, his successor or successors in trust, with the written consent of at least one of my said grandchildren, to lay out and plat any of the lands belonging to said trust estate which may lie in or near any city, town, village or railway station, into blocks and lots and dedicate reasonable parts thereof for streets, alleys and parks, and sell such lots upon the terms and conditions hereinabove stated.

"15. It is my will, and I so direct, that at the time or times within the period of five (5) years next after said improvements in East Fort Dodge, Iowa, to the amount of one hundred and fifty thousand ($150,000) dollars have been made and paid for, when said trustee, his successor or successors in trust, may have on hand, from the rents and profits of said trust property and the sales of portions thereof, a surplus of moneys over and above the amount

required for the erection of buildings and making improvements as directed or authorized, for the payment of mortgage debts, interest thereon, said annual special sums and annuities, taxes and assessments, for insurance, compensation of trustee, and any other outlays authorized or necessary for the proper administration of said trust estate, he, the said trustee, his successor or successors in trust, shall invest such surplus in lands, improved or unimproved, in DeWitt county or McLean county, Illinois, or in Webster county or Hamilton county, Iowa, as in his judgment is or may be for the best interests of said trust estate, and the same shall thereafter be held as part of the principal of said trust estate.

"16. I do hereby authorize and direct that all the proceeds of any and all real property sold by said trustee, or his successor or successors in trust, after the expiration of said period of five (5) years, shall also be re-invested in lands, as above stated, in said DeWitt and McLean counties, Illinois, and said Webster and Hamilton counties, Iowa, and the same shall thereafter be held as part of the principal of said trust estate.

"17. I hereby further authorize and empower said trustee, his successor or successors in trust, with the previous written consent of all of my said three grandchildren and with the approval of the circuit court of DeWitt county, Illinois, to sell and convey any of my lands and lots, wherever situated, for immediate re-investment of the proceeds thereof, and with such consent and approval to re-invest such proceeds in lands and lots in the said counties of DeWitt and McLean, Illinois, and in said counties of Webster and Hamilton, Iowa.

"18. In case of the destruction of any of the buildings belonging to said trust estate by fire, windstorm or the like, I hereby authorize and empower the trustee for the time being under this will, with the insurance money, if any, and trust funds, to rebuild.

"19. After the expiration of said period of five (5) years all ordinary improvements and repairs on the lands and buildings belonging to said trust estate must be made at the expense of the persons enjoying the annual net income from the rents and profits of said trust estate, as hereinafter provided. But if they are unable to agree as to the amount to be expended in such improvements and repairs, and fail to make what, in the judgment of the trustee for the time being and of those entitled to one-third ($\frac{1}{3}$) of such net income, would be necessary improvements and repairs to fit the lands and buildings in Illinois and Iowa for rent for fair prices, it is my will, and I so direct, that such trustee shall make, or procure to be made, such improvements and repairs and deduct the same from the rents and profits thereof before making distribution of the annual net income.

"20. It is my will, and I so direct, that annually, in the month of March of each and every year after the expiration of said period of five (5) years, said trustee, or the trustee for the time being acting under this will, shall pay to each of my three grandchildren, during his or her life, one-third ($\frac{1}{3}$) part of the net income from the rents and profits of said trust estate, that is to say, the one-third ($\frac{1}{3}$) part of the surplus of said rents and profits remaining after the payment of the said annual special sums and annuities, taxes and assessments, insurance, interest on any mortgage debts, installments thereof, compensation for the trustee, and for any other outlay authorized or necessary for the proper administration of said trust estate. And it shall be the duty of such trustee to pay annually the one-third ($\frac{1}{3}$) part of such net income to each of my said three grandchildren in person, and not upon any written or verbal order, nor upon any assignment or transfer by him or her.

"21. It is my will, and I so direct, that upon the death of any one of my said three grandchildren, Lena E. Dins-

more, Thomas Thornton Snell and Harry C. Snell, before the final distribution of said trust estate, any annuity or sum of money and income that would otherwise be paid to him or her under the provisions of this will shall thereafter be payable to him or her heirs of my blood, and upon the death of any such heir before the final distribution of said trust estate, the income that would otherwise be paid to such heir shall thereafter be payable to his or her heirs of my blood, and so on during the continuance of said trust estate.

"22. If one or more of my said three grandchildren should be dead when, as stated herein, the consent or request of one or more of them is required for any purpose mentioned herein, it is my will, and I so direct, that the consent or request of the person or persons, or of a majority of them, succeeding to the beneficial interests of such deceased grandchild or grandchildren, or the consent of the guardian or guardians of such person or persons, shall be sufficient for such purposes.

"23. It is my will, and I so direct, that each and every annuity or sum of money directed to be paid annually under the provisions of this will shall be paid to the beneficiary thereof, or his or her guardian, in person, and not upon any written or verbal order, nor upon any assignment or transfer by him or her, provided that no money shall be paid by any trustee acting under this will to or for any person while under the guardianship of John W. Dinsmore.

"24. It is my will, and I so direct, that should my son, Richard Snell, at his decease leave any heirs of his body, said trustee, or the trustee for the time being acting under this will, shall annually in the month of March of each and every year thereafter, pay to such heirs one-fourth ($\frac{1}{4}$) part of the said net income from the rents and profits of said trust estate, and that upon the death of any such heir before the final distribution of said trust estate the income

that would otherwise be paid to such heir shall thereafter be payable to his or her heirs of my blood, and so on during the continuance of said trust estate. And in order to give full effect to this provision of my will, the twentieth and twenty-first provisions hereof are hereby so qualified and modified, in case my said son, Richard Snell, at his decease leave issue him surviving, that thereafter the income to each of my said three grandchildren, his or her heirs of my blood, and so forth, as provided in said provisions, shall be reduced from one-third ($\frac{1}{3}$) part to one-fourth ($\frac{1}{4}$) part of the whole net annual income of said trust estate, and in such case any other provisions of this will are to be treated as qualified and modified to the extent that may be necessary or proper to carry out the true intention of the whole of this will.

"25. Upon the decease of my said son and all of my grandchildren and of all my great-grandchildren who were living at my decease, I will and direct that all the principal of said trust property shall go to and vest absolutely, free of trust, among my descendants then living, in equal parts, whatever may be their respective degrees of relationship, such descendants taking per capita and not *per stirpes.*

"26. Upon the resignation, death or removal of said trustee or any successor in trust, or upon the failure to act, for any cause, of any trustee under this will, the circuit court of DeWitt county, Illinois, is hereby authorized and requested to appoint as his successor in trust any competent person agreed upon by my said three grandchildren, Lena E. Dinsmore, Thomas Thornton Snell and Harry C. Snell, or by any two of them, or if two of them can or do not agree, any person at the discretion of said circuit court, provided he be other than John W. Dinsmore. Upon the petition, with or without good cause, of any one of my said grandchildren the said circuit court is hereby authorized and requested to remove any trustee under this

will and require him to make settlement of his accounts as such trustee.

"27. It is my will, and I so direct, that said Lincoln H. Weldon shall not be required to give a bond; that any successor in trust selected by said three grandchildren, or any two of them, shall be required to give a bond, unless bond shall be waived by two or more of them, and that any trustee selected by the said circuit court shall be required to give a sufficient bond for the faithful performance of his duties as trustee.

"28. It is my will, and I so direct, that such compensation for the services of said Lincoln H. Weldon as trustee, and for the services of any other trustee selected by the said three grandchildren, or any two of them, as shall be agreed upon by and between the trustee and said grandchildren, or any two of them, shall be allowed, and that a reasonable compensation shall be allowed to any trustee selected by the said circuit court.

"29. It is my will, and I so direct, that any one of my said three grandchildren, in accordance with the request of the other two grandchildren, may be appointed successor in trust, with or without bond.

"30. It is my will, and I so direct, that each and every trustee acting under this will shall, in the month of March of each year during the period of his trusteeship, make a settlement of his accounts as such trustee.

"31. It is my will, and I so direct, that all the powers and duties herein given to and enjoined upon said Lincoln H. Weldon, as trustee, shall devolve upon each and every trustee for the time being under this will.

"32. In order to prevent, as far as may be, litigation between the legatees and beneficiaries of my said will, I do hereby order and direct that in case any of them shall by any suit or other proceedings, either in law or in equity, seek to contest, set aside, overthrow or avoid my said will, then all annuities and bequests in my said will contained,

to or for the benefit and use of such person or persons so contesting, shall cease and be of no effect, and all annuities and bequests to or for the use and benefit of such of the legatees and beneficiaries herein named as may make such contest shall thereupon inure to those grandchildren therein mentioned who do not make such contest, with the same effect as if such last mentioned grandchildren had been, as legatees or beneficiaries, in the place of any of those contesting as aforesaid, subject to all limitations and provisions in my said will contained.

"33. I appoint said Lincoln H. Weldon, the trustee hereinbefore named, to be the executor of this my will, and request that he be not required to give bond or security for the fulfillment of the duties of executor."

On the 28th of November, 1904, the testator executed the first codicil to his will, which is as follows:

"I, Thomas Snell, of the county of DeWitt and State of Illinois, do make and declare this to be a codicil to my last will and testament. Said last will and testament was executed by me on the tenth day of December, 1901, and this codicil is attached thereto.

"*First*—I hereby revoke the fourth clause of my said will, in which clause of said will I authorized and directed the trustee of said will, his successor or successors in trust, to pay to Joseph Snell annually, so long as he lives, the sum of four hundred dollars ($400), and to Mrs. Clara Belle DeLand annually, so long as she lives, the sum of four hundred dollars ($400), and to my great-niece, Mabelle Snell, daughter of my nephew, Thomas Snell, annually, so long as she lives, the sum of four hundred dollars ($400), and it is my will and desire, and I hereby authorize and direct the said trustee, his successor or successors in trust, to pay annually in the month of March in each and every year after the year of my decease, the following annuities to the persons named below, as follows: To my brother, Joseph Snell, so long as he may live, the

sum of six hundred dollars ($600); to my great-niece, Mabelle Snell, the daughter of my nephew, Thomas Snell, annually, so long as she may live, the sum of six hundred dollars ($600). And I hereby declare the above bequests to Joseph Snell and Mabelle Snell to be in lieu of the said four hundred dollars ($400) in said clause 4, and I hereby revoke entirely the bequest in said clause 4 to Mrs. Clara Belle DeLand.

"*Second*—I hereby revoke and set aside entirely clause 24 of my said will, in which clause I will and direct that should my son, Richard Snell, at his decease leave any heirs of his body, said trustee, or the trustee for the time being acting under this will, shall annually in the month of March of each and every year thereafter pay to such heirs the one-fourth part of the said net income from the rents and profits of said trust estate. It is my will and desire now that all of said clause making said bequest and relating thereto be set aside, and I do hereby revoke and set the same aside.

"*Third*—I hereby modify the fifth clause of my said will in this: I authorize and direct said trustee, his successor or successors in trust, to pay annually to my son, Richard Snell, the sum of fifty dollars ($50) in the month of March in each and every year after the year of my decease, so long as he shall live, and this bequest of fifty dollars annually to my said son is in lieu of the one thousand dollars ($1000) mentioned in said clause 5.

"*Fourth*—I will and bequeath to the children of my said brother, Joseph Snell, as follows: Charles Bergen Snell, Elizabeth Stark Allen, Ida May Heller, Mary Isabell Rhyne, William Alphonso Snell, George Albert Snell, Leonard Lamont Snell and Lora Augusta Rayne, as follows: To each of them the sum of one thousand dollars ($1000), to be paid to them within one year after my death, and also to each of them the sum of two thousand dollars ($2000), to be paid to them at the end of three

years after my death, it being my will and purpose to give each of said children of my brother, Joseph Snell, the sum of three thousand dollars ($3000), payable as above."

Again on November 29, 1905, a second codicil was executed, as follows:

"I, Thomas Snell, of the city of Clinton, in the county of DeWitt and State of Illinois, being of sound mind and memory, do hereby make, ordain, publish and declare this as a second codicil to my last will and testament made by me on the 10th day of December, A. D. 1901.

"*First*—I give and devise to my grand-daughter, Lena E. Dinsmore, absolutely, in fee simple, the following described real estate, to-wit: The north half of section sixteen (16), township twenty-one (21), north, range three (3), east of the third P. M., in Wilson township, DeWitt county, Illinois.

"*Second*—I will and bequeath to my grand-son, Thomas Thornton Snell, one hundred and seventy-five shares of the capital stock of the St. Joe Valley Bank, situated at Elkhart, Indiana. I also give and bequeath to my said grand-son, Thomas Thornton Snell, a certain note, and all unpaid interest thereon, dated April 15, 1903, due January 1, 1904, for the sum of six thousand dollars, payable to me, and signed by T. T. Snell and T. Thornton Snell.

"*Third*—I give and devise to my grand-son, Harry C. Snell, absolutely and in fee simple, all of that part of the following described real estate which I own, and which was set off to me in partition proceedings in the DeWitt county circuit court when the same was divided after the death of my son, James Thornton Snell, to-wit: The south-east quarter of the north-east quarter, the east half of the north-west quarter, the north-east quarter of the south-west quarter, the east half of the north-west quarter of the south-west quarter, the south-east quarter of the south-west quarter, the south-east quarter, except the

south-east quarter of the south-east quarter, and the west half of the south-east quarter of the south-east quarter, all in section eight (8), township nineteen (19), north, range two (2), east of the third P. M., in DeWitt county, Illinois, that part which I hereby devise being about one-third of the above described land.  I also will and bequeath to my said grand-son, Harry C. Snell, two hundred shares of the capital stock of the St. Joe Valley Bank, situated at Elkhart, Indiana.  I also give and bequeath to my said grand-son, Harry C. Snell, a certain note dated June 1, 1905, due one day after date, for the sum of fifteen hundred dollars, payable to me and signed 'H. C. Snell.'

"*Fourth*—I will and bequeath to my three grandchildren above named, Lena E. Dinsmore, Thomas Thornton Snell and Harry C. Snell, all of that part of my claim probated in the McLean county probate court against the estate of James Thornton Snell, deceased, which remains unpaid at the time of my death, and hereby give them full power and authority to release and discharge the same on the records of said court.

"*Fifth*—I hereby modify clause 2 of my said will, adding the following provision: 'At the expiration of the trust created by my said will, as provided therein, my said trustee, his successor or successors in trust, shall pay over to the Clinton Cemetery Association, owning the burial ground where said vault shall be situated, the sum of fifteen hundred dollars, to be held by the said association in trust perpetually, and to be loaned on entirely safe and sufficient security, and the income therefrom shall be devoted, so far as is necessary, to keep said cemetery lots in good order, and the grounds in blue grass, and suitable flowers at the proper seasons, and to make needed repairs on said. burial vault from time to time as the same are needed.'

243—33

"*Sixth*—I hereby modify clause 9 of my said will by adding after the word 'sold,' in line 6 of said clause 9, the following: 'and from any money which he may borrow under the provisions and limitations in clause 12 of my said will relating to raising money by mortgage.'

"*Seventh*—I hereby modify clause 12 of my said will in this: that the said trustee, his successor or successors in trust, shall not be limited in making mortgages on the real property to be improved, but I hereby authorize and empower him to make such mortgage or mortgages as are provided in said section 12 on any of the real estate which he holds as such trustee, as may seem to him most advantageous to my estate, by and with the written consent of at least two of my said three grandchildren.

"*Eighth*—I further will that in the event that my said trustee, his successor or successors in trust, shall borrow money according to the provisions and limitations to my said will and this codicil, the lender of such money shall not be required to look to the application of the same.

"*Ninth*—I hereby modify clause 8 of my said will, and hereby make it the duty of my said trustee, his successor or successors in trust, to rent vacant lots, where he can do so to the advantage of my estate, on the same terms as other real estate, as provided in said clause 8. And I further modify the same by giving him power to make longer leases of real estate than as provided in said clause 8, on the written consent of at least two of my said three grandchildren.

"*Tenth*—I hereby modify clause 11 of my said will in this: that the said trustee, his successor or successors in trust, may sell promissory notes at their fair cash market value upon the written consent of at least two of my said grandchildren.

"*Eleventh*—I hereby modify clause 13 of my said will in this: that I hereby authorize and empower my said trustee, his successor or successors in trust, to sell the real

estate described in said clause 13, or such part of the same as I may own at the time of my death, on such terms as to payment as he in his discretion may consider of advantage to my estate, he being careful not to sacrifice such property in the sale thereof.

"*Twelfth*—I hereby desire to define and make clear my meaning contained in clause 25 of my said will. By said clause I mean to direct that upon the death of my said son and all of my grandchildren and great-grandchildren who were living at the time of my death, that all the principal of said trust property shall go to and vest absolutely, free of trust, among my descendants then living, in equal parts, whatever may be their respective degrees of relationship, such descendants taking per capita and not *per stirpes;* that is to say, such distribution shall be when my said son, and when my grandchildren living at the time of my death, and my great-grandchildren living at the time of my death, are all deceased."

Again on October 9, 1906, the testator executed the third and last codicil, which is in the following words:

"I, Thomas Snell, of the county of DeWitt and State of Illinois, being of sound mind and memory, do hereby make, ordain, publish and declare this as a third codicil to my last will and testament made by me on the 10th day of December, A. D. 1901.

"I hereby modify the first clause to the first codicil of my said last will and testament in this: I hereby will and bequeath to my great-niece, Mabelle Snell, the daughter of my nephew, Thomas Snell, annually, so long as she may live, the sum of twelve hundred ($1200) dollars in lieu of the six hundred ($600) dollars which I willed and bequeathed to her in the said first clause of the first codicil to my said last will and testament."

*First*—Appellant contends that the court had no jurisdiction of the person of Harry W. Snell and that the court erred in overruling his plea to the jurisdiction. It

was held by this court on the former hearing that Harry W. Snell was a necessary party to the bill. After the remanding order had been filed in the circuit court, but before the notice had been served that the cause would be re-instated for trial, appellee gave notice of his intention to apply to a judge of the circuit court, in vacation, for leave to amend the bill by making Harry W. Snell a party defendant. Leave was obtained and this defendant was brought in by summons before the case was re-instated for trial and before the ten-day notice required by section 113 of the Practice act was served. The infant defendant thus brought into court, by his guardian *ad litem* filed a plea setting up that he was born on December 31, 1907, and that the appellee was duly notified of his birth within one week thereafter; that he was a necessary party to said bill, but that no steps were taken by appellee to make him a party to said bill until April 22, 1909, when he was made a party as above stated. The circuit court held this plea was insufficient, and thereupon the guardian *ad litem* filed an answer for the infant defendant. More than a year having elapsed before Harry W. Snell was made a party, appellant contends that the court had no jurisdiction to entertain the bill.

There was no irregularity in the manner of making Harry W. Snell a party. The statute authorizes amendments to pleadings, upon notice, in vacation. After the judgment was reversed and the cause remanded and the remanding order filed in the circuit court the cause was then pending in that court, and the court had jurisdiction of the subject matter of the cause but could not properly proceed to the trial of it until the ten-day notice required by the Practice act was given to the opposite party. (*Austin* v. *Dufour,* 110 Ill. 85.) The situation of the cause at that time was similar to a case pending in the court before service of the defendant. Where a person files a declaration at law or a bill in chancery the court thereby acquires

jurisdiction of the subject matter and of the person bringing the suit. While the case is in this condition, and before the defendants are served or otherwise brought within the jurisdiction of the court, there is no doubt of the power of the court to permit amendments to the plaintiff's pleadings, and we see no reason why the same rule would not apply to a cause after it has been remanded by an appellate tribunal. When a cause is reversed and remanded for a re-trial it is the duty of the court to allow such amendments as will obviate errors pointed out by this court. (*Dinsmoor* v. *Rowse*, 211 Ill. 317.) The original bill was filed within the time required by the statute, and all persons then in being who had any interest in the subject matter of the suit were made parties. The amendment of the bill making a new party one who came into being after the commencement of the suit was not the commencement of the suit, hence the plea to the jurisdiction of the court setting up these facts presented no defense and was properly overruled.

The language of this court in *Austin* v. *Dufour, supra,* which is relied on by appellant as sustaining the contention that any order made by the trial court prior to the giving of the ten-day notice and the entry of the order re-instating the cause was void, has no reference to an *ex parte* order for leave to make a formal amendment, which is granted as a matter of course, and upon which the opposite party could not assign error even if he were in court and objecting to the entry of such order.

*Second*—When this case was before this court on the former hearing we had occasion to consider the evidence then in the record bearing upon the question whether the will was shown to have resulted from the undue influence of Mabelle Snell, and the conclusion was reached that the evidence wholly failed to establish that charge. The question of general mental capacity of the testator was also considered in the light of the evidence then in the record,

and our conclusion was, in respect to this issue, that the evidence would not support a decree setting aside the will on that ground. The question of the existence of an insane delusion in the mind of the testator in regard to his son, Richard Snell, was not considered or discussed by this court at that time. On page 294 of the opinion then rendered, upon the question of the existence of an insane delusion, this court said: "Unless the testator's conduct proved the existence of an insane delusion it would be no reason for setting aside the will. Injustice, unfairness, prejudice or anger, without a reasonable cause, does not disqualify any person from making a valid will. Since the cause is to be remanded for a new trial we express no opinion as to the weight of the evidence on the question of the existence in the testator's mind of an insane delusion with reference to his son." The evidence in regard to undue influence and general want of testamentary capacity is not materially different in the present record from that contained in the former. Therefore we do not deem it necessary to reconsider those questions, since no different conclusion could be drawn from the present record. The general verdict of the jury finding the instruments in question were not the last will and testament of the testator includes a finding for contestant upon all the issues presented by the pleadings and submitted to the jury.

The special findings in the present record are limited to the question of an insane delusion. The bill being predicated upon three distinct grounds, any one of which, if sustained, entitles the contestant to a decree setting aside the will, it is not necessary that the evidence should sustain all of the charges in the bill. If there was either want of general testamentary capacity or wrongful and undue influence shown or an insane delusion established by the testimony, appellee would be entitled to a decree notwithstanding the evidence might be wholly insufficient to establish the other charges in the bill.

In considering the charge of undue influence on the former hearing, in connection with the request to instruct the jury that there was no evidence upon which a finding could rest as to that issue, we concluded our discussion on that question by the statement that the instruction should have been given and that the court erred in refusing to give the same. There was at that time no specific finding that testator was laboring under an insane delusion, and the finding upon that question was necessarily included in the general verdict. There were, however, specific findings that the testator did not have testamentary capacity and that the will was the result of undue influence exercised over the testator. The bill being drawn with a triple aspect, if either ground is established the decree setting aside the will should be affirmed. 3 Ency. of Pl. & Pr. p. 365; Story's Eq. Pl. sec. 254; *Robinson* v. *Robinson,* 73 Mo. 170; *Shipman* v. *Furniss,* 69 Ala. 555; *McConnell* v. *McConnell,* 11 Vt. 290.

The decree in this case must necessarily rest upon the existence of an insane delusion in the testator in respect to appellee. An insane delusion which will render one incapable of making a will is difficult to define with exact precision. In its simplest form, a delusion may be said to be a belief in a state or condition of things in the existence of which no rational person would believe. (*Schneider* v. *Manning,* 121 Ill. 376.) If, without evidence of any kind, a testator imagines or conceives something to exist which does not exist in fact, and which no rational person would, in the absence of evidence, believe to exist, he is afflicted with an insane delusion. (*Middleditch* v. *Williams,* 45 N. J. Eq. 726; 4 L. R. A. 738.) A person who believes supposed facts which have no existence except in his perverted imagination and which are against all evidence and probability, and conducts himself, however logically, upon the assumption of their existence, is under an insane delusion. *In re White,* 212 N. Y. 406.

In analyzing the legal conception of an insane delusion it is necessary to keep in mind that the ultimate and essential thing to be established is that the testator had, at the time the will or instrument was executed, such an aberration as indicates an unsound or deranged condition of the mental faculties, as distinguished from the mere belief in the existence or non-existence of certain supposed facts based upon some sort of evidence. A belief which results from a proeess of reasoning from evidence, however imperfect the process may be or illogical the conclusion, is not an insane delusion. If, under the facts shown, the court is able to see how a rational person might have believed all that the testator believed and still be in the possession of all his senses, an insane delusion is not established. Where a testator has some actual grounds for the belief which he has, though regarded by others as wholly insufficient, the mere misapprehension of the facts or unreasonable and extravagant conclusions drawn therefrom do not establish the existence of such a delusion as will invalidate his will. *Stackhouse* v. *Horton,* 15 N. J. Eq. 202; *Martin* v. *Thayer,* 37 W. Va. 38; *Wait* v. *Westfall,* 161 Ind. 648; 68 N. E. Rep. 271; *Owen* v. *Crumbaugh,* 228 Ill. 380.

The establishment of an insane delusion involves proof that the testator in this case believed certain things concerning his son which did not exist; that he had no evidence on which to base such belief; that the things which he believed were false and were adhered to by the testator after their falsity had been shown by reasonable evidence; that the things which the testator believed were such things as no person of sound mind would believe; that the testator refused to yield or give up such irrational belief in the face of such reasonable evidence as would convince an ordinarily sound and healthy mind; and lastly, that the existence of such delusion was pres-

ent in the mind of the testator and exercised a controlling influence over him at the time the will was executed.

The evidence bearing upon the several elements of an insane delusion in this record is very voluminous. It would not be practicable to discuss it in detail without extending this opinion to an unreasonable length. The evidence establishes the fact that prior to the year 1896 the testator regarded Richard Snell with paternal confidence and affection. He trusted him to manage large landed interests in the State of Iowa, and frequently used expressions showing his appreciation of the ability and integrity which the appellee had exhibited in managing his father's important affairs. If prior to this time the testator had ever used any harsh words in regard to appellee, it is clear that such expressions were the outbursts of temporary anger and did not indicate any fixed or settled belief in the testator's mind that the appellee possessed such character as might have been implied from such heated expressions. It is clearly shown that the testator was of a nervous and excitable temperament. Prior to 1896 the testator had another son, Thornton Snell, to whom he was very much attached. Thornton Snell was connected with a bank in Bloomington in which the testator was interested as a stockholder. In 1896 the testator was suddenly called to Bloomington on account of the serious illness of his son Thornton. He went immediately. Upon arriving at the station he was informed that his son was dead. Thornton had died very suddenly, having taken sick at three o'clock in the afternoon and died at six that evening. The news of the sudden death of Thornton was a great shock to the father. He fell prostrate upon the platform and became almost a maniac with grief. He screamed and beat the platform with his arms and refused to be taken to Thornton's home. He was apparently in a dazed condition for some time after the death of his son. Some days after Thornton's death the testator said, while weep-

ing over his son's death, that he had lain there in the house for a day and a half before his death with no one to talk to him. He was greatly troubled and depressed in spirit and spoke of being blue, and said that all of the boys were now gone. The evidences of a mental break-down began to manifest themselves soon after the death of Thornton. He sent for his son Richard to come from Kansas City to Clinton to become president of the DeWitt County National Bank. He gave him fifty shares of his stock in the bank and assured persons interested that Richard would prove to be a success in the bank. He said that he was the best boy he ever had; that he had made him more money than any of his boys, and that he would make a first-class president of the bank. The intimate friends and associates of the testator testified to the marked change that they soon discovered in the manner and disposition of the testator. He grew melancholy and seemed to shun the company of his old friends. He became careless and indifferent about his dress. He muttered to himself almost constantly and was frequently heard talking to himself after Thornton's death. He wandered aimlessly about the public square in Clinton and would sit for hours talking to himself in front of the bank. He would walk the streets with his shoes unlaced, sometimes without a coat and with the balance of his clothing improperly adjusted. He would pray at times and in a few moments afterward would be cursing. Before the death of Thornton he was a man who joked a great deal, but afterwards this spirit gave way and he became cross and morose. All of these conditions grew gradually worse from the time of his son Thornton's death until the testator died. He became quarrelsome and hard to get along with. He was very irritable, and would fall out and quarrel with his most intimate friends and want to fight over matters of the most insignificant nature. He would get up from his bed in the night time and walk the floor, sometimes singing, some-

times crying, sometimes praying and sometimes cursing. These manifestations were very marked in the years 1900, 1901 and 1902, when the testator lived at the home of Mrs. Thornton Snell. He had a habit of writing letters and talking to himself while writing, and would sit on the floor and read letters and chuckle over them as a child would over its playthings. He would go out and sleep on the ground, without his shoes or coat on, by the side of the pavement, where people were constantly passing. At one time he bought some medicine from Dr. Meyers and afterwards complained that the medicine had done him no good, and upon examination the medicine was found in his pocket, no part of which had ever been taken by him.

The evidence shows beyond controversy that Richard Snell never mistreated his father; that he bore patiently the unrelenting and offensive abuse which the testator heaped upon him, and on one occasion when the testator, without any cause, assaulted the appellee in the bank, he mildly asked his father not to make so much noise in the bank. The evidence further shows that the appellee has always sustained an unimpeachable character for honesty and integrity in the community where he has always been known; that appellee has never been suspected of any dishonorable conduct toward his father or any other person; that he is a lawyer by profession and enjoys the confidence and respect of the members of his profession.

After the death of Thornton Snell, Richard was the only surviving child of the testator. His wife died in 1875. Ordinarily and in the usual and natural order of things we would expect to see this father clinging closer to the last survivor of his family in the declining years of his life than would be expected had his wife and other children lived to share his love and devotion. But the evidence shows quite the contrary. About the year 1899, without any cause so far as the evidence shows, the testator's feelings for his only son underwent a marked and

unnatural change. He was seized and dominated by an unreasoning and unnatural hatred toward his son. So far as the evidence shows, after this morbid feeling of antipathy fastened itself upon the mind of the testator it never thereafter relinquished its grasp upon him, even for one single moment. He seems never to have spoken another kind word to or of his son. While the fire of his unnatural hatred was not always in a state of eruption, it is certain that it was always smouldering, ready to break out at the slightest provocation. At all times and under all circumstances, in public and private places and in the presence of all classes of people, whenever the testator had occasion to refer to appellee he heaped upon him the vilest epithets known to the English language. To repeat any considerable portion of the language employed by the testator in reference to appellee, as repeated by the witnesses, would serve no good purpose. Suffice it to say that he repeatedly and habitually called appellee a g—— d—— s—— of a b——, a bastard, a thief and a robber, almost as often as his name was mentioned in his presence. He threatened to kill appellee, and said he had robbed him. Sometimes he would say appellee had stolen $10,000 from him; at other times, $20,000; at other times, $40,000, $150,000, and sometimes he would mention $500,000 as the amount that appellee had cost him.

These expressions were used by the testator so frequently and so persistently that it is impossible to account for them upon any theory consistent with the soundness and sanity of the testator. It is not a case of an excitable old man getting angry and giving vent to his feelings by the unrestrained abuse of another and afterwards regaining his equilibrium so as to take a rational view of the matter, but it is rather the case of one who is laboring under a mental disorder which, without any apparent reason, produced in his mind a fixed and unreasonable belief that his only son was one of the vilest of men. This belief

came upon the testator without any reason and remained in spite of the most conclusive proofs that it was groundless. On one occasion, in Judge Hill's office, the testator asserted that the appellee had stolen two $1000 notes of his and that he was going down to the bank to kill him. Judge Hill reasoned with him and told him that he did not believe that Dick had stolen the notes, but he persisted in making the accusation and the threat that he was going to kill the appellee. While this conversation was going on, Argo, who was the confidential agent of the testator, came in and exhibited to the testator the identical notes which he said appellee had stolen. Notwithstanding this demonstration the testator persisted in accusing appellee of stealing and called him vile names, and started off, saying that he was going down to the bank to kill him. The testator was reasoned with by various persons in regard to the charges that he was continually making against appellee, but it had no effect on the testator's mind. On one occasion in the year 1900 a Methodist minister called upon the testator concerning religious matters and the importance of making his peace with his Maker, and in the course of conversation he mentioned the appellee's name. The testator immediately flew into a fit of anger and commenced swearing and calling appellee vile names. Nothing that the minister could say had any effect upon him. When the testator had used vile and profane language concerning appellee to Dr. Meyers, the doctor pointed out to him that appellee sustained a first-class reputation and enjoyed the confidence of his neighbors, but it made no impression on the mind of the testator. He persisted in asserting to Dr. Meyers that appellee had stolen $200,000 of his money. There are many other instances in the record of a similar character, which show conclusively that the delusion which had fastened itself upon the mind of the testator would not yield to any evidence that might be presented to him.

· Under these facts, and many others not herein stated, of the same general character, the jury has found that the testator was laboring under an insane delusion in regard to appellee, who is the natural beneficiary of the testator's bounty and his only living child. We cannot say that this finding is not well supported by the evidence. Did the existence of such delusion influence the testator in making the will and codicils thereto?

By reference to the provisions of the will it will be seen that by the original will appellee was given $1000 per annum during his natural life. In view of the amount of the testator's estate it must strike the mind of any reasonable person as very unusual and extraordinary that a man with an estate worth approximately a million and a half dollars would make a will and give his only son $1000 per annum during his life. The annual income of the testator's estate was between $40,000 and $50,000. If the testator had conceived some charitable purpose which he was anxious to promote, and his anxiety and solicitude for some cherished object of that sort had led him to devise the bulk of his estate for such purpose, it might be said that the testator preferred the promotion of such cherished object of his life to bestowing his estate upon his natural beneficiaries. But there is nothing of that kind present here. There is no rational theory apparent upon this record why appellee should have been virtually disinherited except the explanation afforded by the delusion which the testator had in regard to him. Afterwards, when the unnatural hatred of the testator for appellee had progressed further, he added a codicil to the will reducing appellee's annuity to $50.

While it is true, as said by this court in the former opinion in this case, that "injustice, unfairness, prejudice or anger without a reasonable cause does not disqualify any person from making a valid will," still, where these manifestations habitually appear in respect to the same

subject without any reason and are adhered to after their falsity is demonstrated, they become strong and satisfactory evidence of a mental derangement, and evidence of their existence, without any cause, in respect to one so nearly related as to be naturally entitled to the testator's bounty is entitled to greater weight than it would be if the parties were not so closely related.

The books afford many parallel cases where wills and deeds have been set aside because of an insane delusion, the manifestations of which were similar to those in the case at bar. Thus, in *Barbo* v. *Rider*, 67 Wis. 602, the court says: "No argument is required to prove that such a change in the nature and conduct of Barbo, such unreasonable and unfounded hallucinations respecting the chastity of his wife, and his causeless hostility to his family, which yield to no reason or persuasion, are sufficient evidence that he is the unfortunate victim of insane delusions."

In *Broughton* v. *Knight*, 3 L. R. (P. & D.) 75, it is said: "It is unfortunate that fathers and mothers take unduly harsh views of the character of their children, sons especially. That is not unknown. But there is a limit beyond which one feels that it ceases to be a question of harsh, unreasonable judgment of character, and that the repulsion which a parent exhibits toward one or more of his children must proceed from some mental defect in himself. * * * I say there is a point at which such repulsion and aversion are themselves evidence of unsoundness of mind."

In the case of *Ballantine* v. *Proudfoot*, 62 Wis. 216, the court says: "She carried her dislike to that extent that she did not wish her daughter to see her while alive. In view of these incontestable facts we must consider her insane and incapable of making a will, notwithstanding she may have a sound mind in other respects. * * * It is rare that a mother, without the greatest provocation,

entertains such an aversion to a daughter that she refuses to see her in her last illness; and yet but a few hours before she died Mrs. Stewart was asked if her daughter should not be sent for, and she replied she did not wish to see her daughter; that the Proudfoots might come and look upon her after she was dead. Such unnatural feelings are so contrary to human nature that we are inclined to account for them on the ground that the mother at the time was not herself but was laboring under some mental disorder."

In *Hardenburg* v. *Hardenburg*, 133 Iowa, 1, the Supreme Court of that State used the following language: "From a careful examination of the evidence we are fully satisfied that these delusions were insane in nature and quality. At the time of the contest the daughters were women of high standing and respectability in the community where they resided. There had been nothing in their conduct, either in their private life or in public, indicating that they were not women of the severest virtue, and yet the charges of unchastity were frequently made against them. It is true, the charges were not made to the public but were confined to the members of his own family, and oftentimes made direct to the persons accused."

Since every case of this character is to be determined from its own facts, the multiplication of parallel cases would serve no useful purpose. Our conclusion from a careful consideration of all of the evidence in this record is, that the testator was the victim of some mental disorder which was manifested by his unreasonable and unfounded hatred of his son, and that this mental disease affords the only reasonable explanation of the character of the will in question, and that the decree of the court setting aside the will is sustainable, under the evidence, on the ground that the testator was disqualified, by reason of such delusion, from making a valid will.

*Third*—Appellant contends that the court erred in giving instructions Nos. 1 to 6, inclusive, for appellee. The same objection is made to instructions 1, 3 and 4, and they may be considered together. These instructions told the jury that if the testator was laboring under an insane delusion upon "subjects connected with the testamentary disposition of his property and the natural objects of his bounty when he made the will," he was not of sound mind and memory and that the jury should find against the will. The objection pointed out to these instructions is, that there was no charge in the bill that the testator had an insane delusion upon "subjects connected with the testamentary disposition of his property" and that no evidence on that question was submitted to the jury. These same instructions were given on the former trial, the record of which was reviewed by this court, and they were then objected to by appellant. The giving of erroneous instructions was not among the reasons given for the reversal of the former decree. Since the case had to be reversed and remanded for another trial, if any serious objection had been pointed out to the instructions this court would have noticed them for the guidance of the court on the re-trial of the case. The fact that none of the objections were discussed may not amount to an express approval of them, yet it is at least fairly to be implied that the court did not regard the objections as sufficiently serious to require a reversal of the decree.

But conceding that appellant is entitled to again urge these objections, there are no just grounds of complaint against either of the three instructions now under consideration. The bill charged that the testator was of unsound mind and memory. The answer denied this charge, and this made the issue. The bill went further and charged that the testator had an insane delusion in regard to his son. This was merely an amplification of the main charge that the testator was of unsound mind and memory or a

pleading of evidentiary facts. It was not necessary to set out the particular manner in which such unsoundness of mind manifested itself, and if the pleader should allege some of the evidentiary facts bearing upon the main issue he would not be precluded from introducing other evidence of mental unsoundness. In *American Bible Society* v. *Price,* 115 Ill. 623, this court said (p. 635) : "The instructions given at the instance of the proponents are claimed to be erroneous because insane delusion in respect of the contestant [testator] is not specifically charged in the bill. It is contended that the jury are directed by these instructions to find a verdict upon an issue not made by the bill and answer. The bill, it has been seen, charges that the testator had become, and was at the time of the making of the will, of unsound mind and memory, thus, in effect, simply putting in issue his testamentary capacity, which by our statute is defined to be that of being of a prescribed age and 'of sound mind and memory.' The only material question, manifestly, under this allegation, was whether the writing produced was the product of an unsound mind and memory. The specific name applied to describe that unsoundness, the means whereby the unsoundness was caused, or how it came about that the unsound mind and memory caused this writing to be drawn and signed, were matters of evidence that need not be alleged, and if alleged need not be proved."

A further reason why appellant's objections to these instructions are not tenable is, that the objections are based on a misapprehension as to the true meaning of the instructions. The words "subjects connected with the testamentary disposition of his property," when read in connection with the context of the instructions, means any person, matter or thing connected with the testamentary disposition of his property, and includes the persons to whom devises are made as well as the things devised. There was no error in the giving of these instructions.

Appellant finds fault with instruction No. 2 given for the appellee. That instruction relates to that phase of the evidence concerning the legitimacy of appellee, and tells the jury that if the testator doubted and denied his paternity of the contestant, and that his belief, if any, upon this subject was based upon some delusive idea or ideas without any evidence of its truth but which existed only in his imagination, and that such belief was without cause or reason and false in fact and led the testator to make a will and codicils which he would not otherwise have made, then in that event the jury would be warranted in finding that the testator did not know who were the natural objects of his bounty, and that he was of unsound mind and memory. The only objection pointed out to this instruction is, that the weight of the evidence shows that the testator did know who were the natural beneficiaries of his bounty. Our attention is called, in this connection, to the fact that appellee is several times mentioned in the will as the son of the testator. There were two theories on this point presented by the evidence: that of appellee that the testator had uniformly for several years, both before and after the making of the will, spoken of appellee as a bastard; the other theory was that the testator recognized appellee as his son. The evidence was conflicting,—at least to the extent that in the will appellee is referred to as the testator's son. Appellee was entitled to present his theory of this evidence to the jury by the instruction, and the mere fact that appellant may contend that the facts are not as stated hypothetically in the instruction is no objection to the instruction so long as it is based upon the evidence.

Instruction No. 5 is objected to because it authorizes the jury to consider the reasonableness or unreasonableness of the bequests in determining whether the testator was of sound mind and memory. Under the situation presented by the evidence in this case the apparent inequality

or unreasonableness of the disposition made of this vast estate was proper to be considered, in connection with the other evidence, on the question of testamentary capacity. *Kimball* v. *Cuddy,* 117 Ill. 213; *Schneider* v. *Manning, supra,* and cases there cited.

Appellant also criticises instruction No. 6 given for appellee. That instruction is not open to the criticism made against it. The observations already made in disposing of the objection to instruction No. 2 will answer appellant's objection to this instruction.

Appellant also complains of the refusal of three instructions requested by him. There was no error in refusing these instructions. The law applicable to appellant's theory of the case was fully covered by the instructions given on his behalf. We have no doubt that the jury were fully and fairly instructed upon all the rules of law applicable to the issues involved.

*Fourth*—The appellant makes numerous complaints respecting the rulings of the court upon the admission and exclusion of evidence. On the former hearing of this cause numerous errors were assigned upon the rulings of the court upon the evidence, and they were discussed and decided and the rules to be applied were stated. Without going into a discussion, in detail, of appellant's several objections, we find upon examination that the trial court followed our former opinion in this regard. True, appellant now raises some points not then involved, but we do not think there was any serious error committed in the rulings upon them. The trial of this case occupied the time of the circuit court for two weeks, during which about one hundred and twenty-five witnesses were examined. It would be remarkable if during such a trial, involving many objections to the testimony, there were not some errors committed. We do not, however, find any which are of a serious character. Appellant makes some objections to the hypothetical questions put to the expert witnesses and

also complains of certain remarks made by counsel for appellee in their argument to the jury. These objections are trivial and do not affect the substantial merits of the case.

The case appears, on the whole, to have been tried with great care by the court. It has been twice tried by the jury and in both instances the finding was against the will. In our opinion it is time that this litigation should come to an end. We find no error of such magnitude as to require us to reverse the decree. It is therefore affirmed.

*Decree affirmed.*

CARTWRIGHT, HAND and DUNN, JJ., dissenting:

The appeal removed the cause to this court and deprived the circuit court and the judge thereof of jurisdiction in the cause and of power to make any order or take any step in the litigation until the cause should be reinstated in that court. Section 113 of the Practice act provides the method of re-investing trial courts with jurisdiction of a cause after a reversal and remandment, and questions as to what may be done in a suit before service of summons have no relation to the power of the court or judge to proceed in such a case. Section 113 provides that upon a transcript of the order of the Supreme Court remanding the cause being filed in the court in which the cause was originally tried, and not less than ten days' notice thereof given to the adverse party or his attorney, the cause shall be re-instated therein. That language can mean nothing else than that the cause is re-established in the court from which it was removed only by filing the transcript and giving the notice. Until the cause is so re-instated it cannot, in our opinion, be said to be pending in the trial court and any order in the cause would be void for want of jurisdiction. That is the effect of the decision in *Austin* v. *Dufour,* 110 Ill. 85, and no distinction was there made between the order permitting an amendment and the proceedings in term time. Of course, if a suit is

not re-instated in a court so as to give jurisdiction in term time, there can be no power in the judge to make an order in vacation. The question in this case is whether the circuit court obtained jurisdiction of the minor by the vacation order, and if it did not, the want of jurisdiction could not be waived by the minor or his guardian *ad litem*. The fact that an objection to the amendment could not have been successfully interposed in a court or before a judge having jurisdiction affords no aid in deciding whether there was jurisdiction to make any order in the case. We think the judge had no jurisdiction to make the order until the cause was re-instated, and therefore the court had no jurisdiction of the infant, who was a necessary party.