This is a contest over the will of Joseph L. Rein, Jr., who died on November 22d 1943. The testator was a bachelor and left him surviving as his sole next of kin and heirs-at-law his sister, Rebecka Livingston of Philadelphia, and his two brothers, Charles, residing in New Jersey, and Julius, residing in California. Rose Livingston, the person named in the will under attack as sole executrix thereof and beneficiary thereunder, petitioned this court for the probate of that will. Upon service of this court's order to show cause, the sister Rebecka entered her appearance herein and consented to the probate of the proffered will. The two brothers, Charles and Julius, filed their objections to probate, alleging *Page 124 
the following: (1) Mental incompetency; (2) that the will was the result of duress; (3) that the will was the product of undue influence and fraud. The objector Charles Rein made the further claim that the signature on the will "is not the genuine signature of the testator."
The objectors offered no proof of any of their objections other than the one relating to mental incapacity. The case is barren of any proof supporting the claims that the will was the result of duress, fraud or undue influence, or the additional claim that the signature on the offered will is not the genuine signature of the testator. These unsupported objections had been advanced without the slightest reasonable ground or probable cause therefor. When the cause was concluded it had been established that the general form of the will had been prepared for the testator by Mr. Walter B. Gibbons, an eminent member of the Pennsylvania bar, he being the testator's own selection. Mr. Gibbons testified that the testator told him that he wanted to leave his property either to his sister, Mrs. Livingston, or to her daughter Rose, that he felt that his sister was being cared for principally by the daughter Rose and that there was a doubt in his mind as to whether he wished to leave it to Rebecka or to the daughter Rose. Mr. Gibbons told the testator that he would draft a will and that he, the testator, could reach his final decision after he looked over the draft. Such draft was prepared by Mr. Gibbons and delivered to the testator a few days later. At these conferences between the testator and Gibbons no third party was present. About a week later the testator told his niece, Rose Livingston, of the draft prepared for him by Mr. Gibbons and he handed it to her. In that form of will the testator's estate was left to his sister Rebecka. He told Rose to type up a copy of the will with two changes, namely: (1) Where the will recited that he, Joseph L. Rein, was of the City of Philadelphia to change the residence to Newark, New Jersey, and (2) to put in her own name in the place of her mother's name (Rebecka). The reason assigned by the testator for the second change was that he had considered the matter carefully, that he regarded his sister Rebecka as very liberal with money, that if he left *Page 125 
it to her she would very likely spend it or give it to such of her children as asked for it, whereas if he left it to the daughter Rose, who had always taken care of Rebecka, he was confident that she would continue to do so for the rest of Rebecka's life. The will wanted by the testator was typed for him by his niece and, except for the two changes mentioned, was a copy of the form submitted to the testator by Mr. Gibbons. The will was typed by Rose in the late evening of August 14th, 1939, and by the time it was finished it was past midnight. She therefore dated it August 15th, 1939, and handed it to the testator, who folded it together with the Gibbons' form of will (which had been the model) and put both in his pocket. By the newly typed will he left his entire estate to Rose and appointed her executrix. The will was executed the following evening at Philadelphia and its due execution was proved by two of the three attesting witnesses Mayer Feldman and Natalie F. Rosenfeld. Rose Livingston was not present when the will was signed, arriving home about an hour later.
When the objectors went forward with their proofs a strange development occurred. They called as a witness the third attesting witness, Dora Oberlin. She admitted being present at the place and time of execution of the will, testified to by the other two attesting witnesses, but she denied the presence of those other witnesses, recalled no will and questioned her own signature on the will. She admitted that it was her genuine signature but insisted that she had not placed it there and could not recall the details relating to the execution of the will. It was very plain to me that this witness was evasive and untruthful, not daring, however, to go the length of denying the genuineness of her attesting signature. I intended to cite her in contempt for what clearly was a plain perjury and, in fact, took the first step in that direction. I ordered that she be produced before me at a future date, but upon the plea of objectors' counsel that she lived in Pittsburgh, was a person of small means and could ill afford the expense of coming east, and, what is more important, had intended no willful deception, I permitted the matter to be dropped. I entertain no doubt that the two *Page 126 
attesting witnesses, Mr. Feldman and his daughter Mrs. Rosenfeld, testified on the subject of the execution of the will with both truthfulness and precision. They also established the presence and signature of the third attesting witness, Dora Oberlin, who, although she admitted her signature, could not fancy how it got on to the will. Neither Mr. Feldman nor his daughter is in any way related to any of the parties in this contest. They were old friends of the testator and were requested by him to witness the will on the occasion of a family party given at the home of the testator's sister Rebecka.
Under our law only two witnesses are required to the execution of a will passing property in New Jersey. The will here was witnessed by three persons, all of whom signed the attestation clause, which is perfect in form and shows precise compliance with the requirements of our statute concerning the execution of wills. The situation would have been serious indeed if Dora Oberlin, the recanting witness, had been one of only two witnesses to the will. But even then her testimony would have had to fail in the face of the attestation clause and the clear and positive statement of the other attesting witness, both the clause and that testimony showing that the will was duly executed. The contradiction or impeachment of an attestation clause by one of the witnesses thereto is a grave matter and ought not be accepted except upon the clearest and most persuasive testimony. All doubts should be resolved in favor of the facts recited in the attestation clause, and this principally for the reason that the testator, the most important witness, is beyond recall. A somewhat similar situation arose in the case ofFarley v. Farley, 50 N.J. Eq. 434; 26 Atl. Rep. 178, where it was claimed that the testator had not signed the will in the presence of the subscribing witnesses, nor acknowledged his signature in their presence. The will had an attestation clause showing exact compliance with each of the statutory requirements and it expressly declared that both of the attesting witnesses had seen the testator sign the will. However, one of the attesting witnesses testified to the contrary. Vice-Ordinary Van Fleet held that in situations of that kind the attestation clause "is *Page 127 
a most important element of proof." He said: "It is made for the very purpose of preserving, in permanent form, a record of the facts attending the execution of the will, so that, in case of the failure of the memory of the attesting witnesses, or their death, or other casualty, they may still be proved. It is for this reason that the courts have uniformly held that, on proof of the authenticity of the signatures of the subscribing witnesses, the facts stated in the attestation clause must be considered and accepted as true, until it is shown by affirmative proof that they are not." Citing cases.
It would be a most deplorable condition if wills could be overthrown either by the forgetfulness or the perfidiousness of witnesses in whom the testator reposed confidence and who reduced to a permanent memorial in the shape of an attestation clause the facts attending the execution of the will. In In re Halton,111 N.J. Eq. 143; 161 Atl. Rep. 809, Vice-Ordinary Berry expressed the view that a witness' repudiation of his own attestation clause is destructive of any weight which his testimony otherwise might have had and he quotes from text to the following effect: "And, as a matter of law, a person who as a subscribing witness goes upon the stand and upon his oath asserts to be false that which in the execution of the will he, by a most solemn act, asserted to be true, deserves to be discredited, and is worthy of but little belief."
Vice-Ordinary Berry in the Halton Case mentions the opinion of Lord Mansfield in Warrington v. Shelley, 1 T.R. 297, 300, to the effect that a subscribing witness impeaching his own act is deserving of the pillory.
There is no evidence in the case that anybody ever advised the testator how to dispose of his property, let alone influenced him in the matter. The testator was deeply attached to his sister Rebecka, who is an aged widow and with whom he visited frequently and for long periods of time, and whose life savings he had taken from her for investments he promised to make. Provision for her declining years was a matter of deep concern with the testator and the only question in his mind was whether to leave his very modest estate (which, I am informed by the administratorpendente lite, is worth above debts and an unsatisfied money decree entered in this *Page 128 
court no more than $10,000) to her or to her daughter Rose, who lived with her, cared for her, worked as a bookkeeper and helped support their common home. This indecision of choice the testator communicated to Mr. Gibbons when he requested a form of will. This indecision was finally resolved when the testator decided to leave his property to the daughter Rose, rather than to her mother Rebecka, for the stated reason that he regarded Rebecka as too liberal in the spending of money and that by leaving it to the daughter the elderly lady's future maintenance would be more assured. No one suggested this course to the testator and the provisions in his will are entirely the product of his own reason and judgment.
Nor is there anything to the claim of duress. Not a word from any witness showing the slightest compulsion exerted upon the testator.
I come now to the only objection in support of which the objectors offered some testimony, that of mental incapacity. That testimony was to the following effect. Dora Oberlin, the witness concerning whom I have already expressed my appraisal, said that in 1939 she observed that the testator could not see well and that there were some things he could not remember. She testified that he was thin and that he once fell in the yard. This fall is denied by persons who were in a position to see and know. Felix Rein, the son of one of the objectors, said the testator had for some time been forgetful of his whereabouts, would lose his sense of direction, couldn't recall where he had placed his spectacles, and would forget to collect rents due him and to pay taxes on his properties. He said he also observed the testator rolling small balls out of paper. Miss Voroboff (an employee of Felix Rein) testified that the testator would on occasion repeat questions, would be non-talkative for as long as an hour, and would roll paper balls. It might here be observed that the rolling of paper balls as an occupation for nervous hands is not at all uncommon. It partakes somewhat of the practice of "doodling," making geometric figures on paper. In fact, a curious episode occurred while Miss Voroboff was testifying. She is a very intelligent person and undoubtedly *Page 129 
knew the nature and purpose of the hearing at which she was a witness and that the making of little paper balls was relied on by the objectors as some proof of mental infirmity. Upon the conclusion of her direct testimony her cross-examination consisted only of being asked whether it was not the fact that while she was on the stand testifying in the case before me she herself had been making little balls out of a piece of paper. She admitted that that was so. Her answer caused me to look at the floor under her feet where I saw to my surprise that the floor was littered with dozens of little paper balls. I had noticed that she kept her hands in her lap while testifying but that her hands were somehow in motion. I was unable to see what she was doing but her activity was established by her own admission and by the condition of the floor at the point of the witness box.
There was some evidence that on March 29th, 1940, seven and a half months after the will was made at Philadelphia, the testator was discovered in his bedroom at Newark in a state of unconsciousness, overcome by illuminating gas flowing from a gas stove. No evidence was offered, nor was the suggestion made, that this was anything but an accident. It was the season of the year when the testator would use a gas stove to heat the room, and it might well have been, as occasionally occurs, that the gas flame died out because of some momentary interruption in the gas flow. There was no evidence that the testator had done a single of the usual acts evincing a purpose of self-destruction by the inhalation of illuminating gas. No closing of windows or stuffing up of cracks or keyholes. No evidence of any suicidal contemplation. I am very certain that if there had been a single circumstance tending to prove that this episode was other than an accident, the objectors would have come forward with it. The testator was resuscitated and lived for more than three and a half years thereafter with no attempt at self-destruction. I find that the gas episode early in 1940 was an accident. However, I am not to be misunderstood. I do not intend to suggest that even if it were otherwise, even if it had been a suicidal attempt, that would tend to establish mental incapacity seven and a half months previous thereto. Insanity *Page 130 
once shown to exist may be presumed to continue until restoration of mental health is shown, but there is no principle in law that permits the presumption to work retroactively. It might also be added that suicide or attempted suicide is not in and of itself proof of mental incapacity to make a will or proof of general insanity. It cannot be presumed. Suicide is very frequently the act of a person deprived of all reason and self-restraint. But often, it is the recourse of those who ponder over their particular problem and bring to that problem all their faculties and powers of reasoning, reaching the bitter conclusion that to them life is not worth such ordeal as they suffer. Too many persons have not the consolation of religion or the arresting influence of some other sustaining philosophy to make them able "to bear the ills we have than fly to others we know not of." The books are full of instances, and life's experience is even broader, where persons of superior intellectual force and reasoning power have deliberately chosen self-destruction as the solution to what appears to them to be an insufferable difficulty. Vice-Chancellor Backes, in In re Laurenson, 112 N.J. Eq. 623; 165 Atl. Rep. 584, considered the attempt of the testatrix to destroy herself by gas. He said that "* * * the effort was deliberate and, followed by remorse, is powerful evidence of mental stamina — misdirected. Compassionately we speak of the victims as insane, but it takes grit to commit suicide." He held that her spells of depression, her hysterical outbursts and her despondency to the point of attempted suicide were not proof of any testamentary incompetence.
In Koegel v. Egner, 54 N.J. Eq. 623; 35 Atl. Rep. 394, the testator twice attempted suicide before making his will, the second attempt being shortly before the will was executed. He did succeed in killing himself eleven months after making the codicil. Ordinary McGill held that these facts did not prove insanity at the time the will and codicil were made. He held that the state of mind producing suicide or an attempt thereat is, in its very nature, transitory, and by no means establishes mental infirmity at an antecedent or subsequent period of time. He further held that no presumption of fixed or lasting mental aberration arises from such proof. *Page 131 
In In re Kull, 4 N.J. Mis. R. 434, the testator made his will in May and committed suicide in November of the same year. The proofs established that for a number of years he had suffered serious illness and had been highly despondent. His suicide, accomplished six months after the making of the will, was held to indicate no mental infirmity at the time the will was made, the court saying that his act had no reference to antecedent or subsequent periods of time.
In Roche v. Nason, 185 N.Y. 128, it appeared that the testator, who was county judge of Rensselaer County, New York, made his will on November 12th and a codicil the following March. He killed himself two days after executing the codicil. The proof showed that he was a man of education and great ability. The New York Court of Appeals held that insanity is not inferable from the mere fact of suicide and that such act does not warrant the deduction that the man was insane at the time of the suicidal act, or prior thereto, or that he lacked testamentary capacity, for "human experience has often shown that sane men have taken their own lives."
Giving the fullest weight to the testimony of the objectors, it merely amounts to no more than that the testator was at times forgetful, would repeat himself and would occasionally idle his time by rolling paper into little balls. The only medical proof offered came from a Dr. Yaskin, who examined the testator on April 16th, 1940, about eight months after the will was made. His history of the case shows that up until the gas episode on March 29th, 1940, the testator had been in perfect health but that for some months he appeared preoccupied and "slightly forgetful." This medical expert was unable to tell how long the illness which he perceived in April of 1940 had existed, and he said it was impossible to measure its previous duration. When asked whether in his own opinion the testator in August of 1939 (when the will was made) was fit to manage his own business affairs, the doctor said that he didn't know and couldn't answer and that he couldn't say whether in August of 1939 the testator was or was not mentally fit to make a will and that he could not give any opinion that far back. *Page 132 
The foregoing proofs do not show lack of testamentary capacity. Our cases hold that the capacity required to make a will is limited to the testator knowing what property he wishes to dispose of, the natural objects of his bounty, the nature of the testamentary act, and its resulting distribution. "The amount of mental capacity must be equal only to the subject with which it has to deal." His memory may be imperfect, it may be greatly impaired by age or disease, he may not even be able to recall the names of his relatives, he may at times do childish things, speak disjointedly, ask idle questions, repeat questions which have before been asked and answered, and fly abruptly from one subject to another, and yet may possess capacity to make his will.Clifton v. Clifton, 47 N.J. Eq. 227 (at p. 241);20 Atl. Rep. 333.
As against the proof offered by the objectors, there was an abundance of proof from friends and relatives of the testator that until the gas episode in 1940 (seven and a half months after the testamentary act) he was intellectually alert, interested in current events, an habitual reader of the daily press and an interesting conversationalist. Several times each year he would travel alone from Newark to his sister's home in Philadelphia and would return unattended. While in Philadelphia he walked alone long distances to visit friends and relatives. He was interested in real estate activity to the extent that he endeavored to buy property in Philadelphia. He looked after his own person and his business affairs, except as he permitted his nephew to collect some rents for him. True, he had poor vision, had to use a magnifying glass for reading small print and at times was quite worried about a cataract in his eye. Aside from this condition of his eyes, he appears to have been in all respects a perfectly healthy and normal individual until the gas episode in 1940, at which time he was about fifty-eight years of age. He died when about sixty-one years old. It is interesting to note that Charles Rein, one of the objectors, admitted that even after the gas episode the testator was of sound mind. Shortly following that episode, Charles obtained from the testator about $11,000 which the latter had on deposit in two Newark banks. In other litigation before me Charles Rein was examined *Page 133 
about this transaction and he insisted that at the time he took the $11,000 of the testator's money the latter was still well and had not yet become a lunatic. By the cross-examination of Charles Rein this testimony was introduced before me in the present contest.
There remains to be considered the circumstance that the proffered will was typed by the beneficiary named therein. That this constituted "participation" in the preparation of the instrument admits of no argument. But that participation was no more influential in the making of the will than had the testator requested the beneficiary to purchase for him from the stationer a printed form of will complete except for the insertion of the name of the beneficiary, and she had done so. The will was not composed by her. She followed strictly the testator's instruction to copy the will prepared by Mr. Gibbons, making only the two changes already discussed. Her work was wholly mechanical and there was not given to her any discretion whatever in respect of substance, language or form. When that instrument was typed and handed to the testator he placed and kept in his pocket the two unexecuted wills, the one typed in Mr. Gibbons' office and the one typed by Rose Livingston. No one advised him which to execute and it wasn't until the following evening that he chose from the two wills and executed the one here under attack. Thus the testator had another day to reflect upon the matter of the selection and that choice was made and the favored will executed while the beneficiary was away at business. In fact, she didn't know which of the two wills had been executed until long after the event, until sometime in April of 1940 after the gas episode and the sudden and complete collapse of the testator.
Such participation by the beneficiary is in the circumstances of this case without any adverse effect. No presumption of undue influence arises therefrom. The rule concerning the effect of active participation by the chief beneficiary in the drawing of a will was laid down by our Court of Errors and Appeals in Ward
v. Harrison, 97 N.J. Eq. 309 (affirming 96 N.J. Eq. 595) in the following language: "* * * The courts of this state have not gone to the extent to hold that *Page 134 
one actively participating in the drawing of a will, and who is chief beneficiary thereunder, is presumptively chargeable with undue influence. Such a circumstance may or may not be a factor to establish imposition upon the testator, for that is what is meant by the charge of undue influence, and, hence, whether or not there was imposition, must be disclosed by other circumstances and conditions than the mere drafting of a will and being a beneficiary thereunder. * * *" See, also, In re Bottier,106 N.J. Eq. 226.
It is clear to me that this contest is by two brothers who are disappointed in that they were not remembered in the will they now attack. Perhaps they cannot see the justice of the testator's act in so disposing of his property that his only and aged sister will be provided for during the rest of her life. It may well be that the testator took into consideration the greater ability of his brothers to support themselves and their better financial situation. He may have been mindful of certain moral and legal responsibilities he owed her because of moneys he had taken from her. Be that as it may, it was for the testator to weigh these matters and make his own decision. I find that he was competent to do so and that nothing has been shown to effect his competency or otherwise to deny probate to his will. The will will be admitted to probate. A decree to that effect may be presented. *Page 135