(No. 29691.—

EMMA P. JACKMAN, Appellant, *vs.* WARREN H. NORTH
*et al.,* Appellees.

*Opinion filed September 18, 1947—Rehearing denied Nov. 17, 1947.*

MURPHY & ANDERSON, and ORVILLE R. SEITER, both of Joliet, for appellant.

FRANK J. WISE, and ROBERT E. HIGGINS, (DONALD F. WISE, of counsel,) all of Joliet, for appellees.

Mr. CHIEF JUSTICE MURPHY delivered the opinion of the court:

Louise B. Paulson died May 9, 1943. In June of that year the probate court of Will County admitted an instrument to probate as her last will and testament. This action was started in the circuit court of that county by Emma P. Jackman, a sister of Louise B. Paulson, to contest the probate of said instrument on the grounds of mental incapacity, and that its execution was procured by undue influence, fraud and conspiracy. The executor named in the will and all the heirs-at-law and parties beneficially interested in the will were made parties defendant. At the conclusion of plaintiff's evidence, the chancellor sustained a motion for a directed verdict and entered a decree declaring the instrument to be the last will and testament of Louise B. Paulson, deceased, and dismissed the complaint for want of equity. The real estate which testatrix owned at the time of her death is disposed of by the will. These facts appear in the abstract and are sufficient to confer jurisdiction on this court by direct appeal. *Toomey* v. *Toomey,* 350 Ill. 162; *Walker* v. *Walker,* 336 Ill. 191.

Louise B. Paulson was a daughter of Florence B. Paulson who died in September, 1939. Florence B. Paulson had three other children, namely: Elizabeth, intermarried

with William W. North, Emma, plaintiff in this action, married to George Jackman, and Norman, who was never married. Louise and Norman resided with the mother until her death, and thereafter continued to live in the family home until his death June 19, 1942. Louise was never married. Her heirs-at-law are plaintiff, and the four children of Elizabeth North, namely: Florence N. Kaspar, Warren H. North, William P. North and Mary Louise Harrison. The beneficiaries under the will are the North children; plaintiff's three children, namely: George S. Jackman, Jr., Marjorie Vasey and David C. Jackman; and Wilma Cogswell, a stranger in blood. The North children, except Florence N. Kaspar, and the three Jackman children were each bequeathed the sum of $100. Florence N. Kaspar and Wilma Cogswell were each given the sum of $1000. The remainder of the estate was placed in trust, the income of which was to be paid to testatrix's brother, Norman Paulson, and at his death the whole of the trust fund was to go to her niece, Florence N. Kaspar. Warren H. North and Norman B. Paulson were named as executors. The latter having predeceased testatrix, Warren H. North qualified as executor and proceeded with the administration of the estate. Louise B. Paulson had an estate of approximately $40,000, all of which is disposed of by the will, if it is sustained. The will was dated February 27, 1942, and was in testatrix's handwriting.

Plaintiff contends (a) the court erred in directing a verdict for the defendants; (b) that competent evidence was improperly excluded; (c) that there was irregularity in the recording of the verdict; (d) that the chancellor was without jurisdiction to sign the decree, and (e) that there was error in the taxing of the guardian *ad litem* fees.

The error assigned on the court's ruling in directing a verdict presents a question as to whether there is evidence in the record, which, with all its reasonable inferences taken in the aspect most favorable to the plaintiff may be

said to be sufficient in law to support plaintiff's cause of action. Questions as to the credibility of witnesses and weight of evidence are not within the scope of this inquiry. (*Peters* v. *Peters*, 376 Ill. 237; *Greenlees* v. *Allen*, 341 Ill. 262; *Geiger* v. *Geiger*, 247 Ill. 629.) The charges that the execution of the will was procured through undue influence and as a part of a fraudulent scheme and conspiracy remained as issues in the case until the motion for a directed verdict was granted, but they have been abandoned on this appeal.

Plaintiff does not question testatrix's mental capacity on the ground that she was incapable of transacting ordinary business affairs but contends that she was suffering from an insane delusion. It is contended that plaintiff did not make the accusations which testatrix charged her with having made, but that nevertheless testatrix's belief caused her to adopt a mental attitude toward plaintiff which rendered her mentally incompetent to make a will. The allegations of the complaint do not specify the subject matter of the accusations; however, in plaintiff's hypothetical question propounded to two medical experts, the theory is disclosed that testatrix believed plaintiff had accused her, (1) of secreting mail which plaintiff had sent to her mother; (2) of preventing the mother from visiting plaintiff or writing her or sending her money, and (3) of trying to influence the mother against plaintiff. It is clearly shown that testatrix held a dislike for plaintiff, and a sentence in the will demonstrates that such hatred and dislike moved testatrix to omit plaintiff as a beneficiary in her will. The sentence in the will is as follows: "My sister Emma P. Jackman has caused me so much trouble and made such false accusations that I don't feel I should leave her anything." In considering the motion for directed verdict, we may restrict our analysis of the evidence to determine whether at the time of the exe-

cution of the will testatrix was suffering from an insane delusion in regard to plaintiff.

Plaintiff pleaded facts relative to family difficulties which occurred more than twenty-five years ago. There is no denial of such allegations and, although the evidence of the witnesses does not cover all that period, some of it does refer to those early occurrences. Brief reference will be made to such facts to show the family relationship and the attitude of testatrix toward plaintiff. There is some evidence that some of the members of testatrix's family had, for a good many years, regarded her as possessing peculiarities in regard to her attitude toward life. Evidence of this thought is found in a note written by the mother the day following the execution of her will in November, 1922. It was addressed to the other three children, Emma, Norman and Elizabeth. In that note the mother asks that the three children give Louise care and companionship and refers to it as being in the nature of a legacy from the mother. She said she had endeavored to provide for Louise's financial needs, but that in addition she would need the comfort and companionship of her brother and sisters. In 1939 plaintiff addressed a letter to her nephew Warren H. North asking for his assistance in reference to some business matter between plaintiff's mother and herself. In that letter plaintiff refers to Louise's attitude toward her as an "impossible situation." She also says "Louise has hated Margery [plaintiff's daughter] for some reason or other, or no reason, and you know what she has done to me ever since you can remember and as long as I can remember. This last escapade she talked Norman into attacking me. I still don't know what for and was so overcome I don't even remember what he said to me." Later in the same letter she says: "If Mater were herself, I wouldn't ask this but you can see the pleasure Louise is having making me squirm under her power."

In Warren's answer to plaintiff's letter, he declined to express any opinion on controversial matters and said he did not "desire to be brought in on the personal matters between you and the rest of the family." In 1942, soon after the death of Norman, the principal beneficiary, Florence N. Kaspar, wrote plaintiff and in that letter made reference to Louise and expressed the hope that she could change her outlook on life, "it would go such a long way and she would be more contented." George S. Jackman, Jr. (plaintiff's son) testified to the visits he had with the North children in 1927, 1931 and 1939, and the conversations he had with them. He said that Louise's peculiarities, stinginess and selfishness "were subjects to which the conversations always got around to."

Testatrix was about 55 years of age at the time she executed the will. It does not appear that she had any protracted attack of illness or that she had any medical care until her last illness. The immediate cause of death was cerebral hemorrhage, and she died within a few days after the attack occurred. Except for a period in 1914, she was never employed outside the home. The evidence may be summarized as showing that she was miserly, emotional, egocentric, quarrelsome and given to outbursts of anger. There is evidence that on one or two occasions her emotionalism bordered on to hysteria. The evidence supports the inferences that she was not appreciative of what others did for her, and that overtures leading to the re-establishment of friendship by those she did not like were resented or ignored. One witness testified as having seen her on one occasion become enraged, screaming, throwing herself on the bed and wringing her hands. The witness referred to the attack as a "tantrum."

Douglas Boyer, a cousin of plaintiff and testatrix, had in early life been in the Paulson home a great deal. His testimony, however, was limited to conversations that he had with testatrix at the time of the funeral of Florence

B. Paulson in 1939, and the funeral of Norman in 1942. His evidence indicates that he was endeavoring to reason with testatrix and prevail on her to forget the ill will she held toward plaintiff. He said his object was to reconcile her so that plaintiff and testatrix might enjoy the affection and companionship which usually prevailed between sisters. He told her: "Forget your difficulty and forget this foolishness that has been going on." Her reply was: "It may be foolishness to you but not to me. She [plaintiff] has wrecked my life." The witness then said to her: "What George [plaintiff's husband] did has nothing to do with Emma. You should forget all of this business." The reply was: "I just can't forget it." He said: "There is no sense arguing with you," to which she replied: "No, there is nothing you can do about it. I will never forget it." On another occasion he asked her if it was not time to settle the family difficulty, to which she replied: "I will never get over it. I can't get along with Emma; that is all there is to it."

Anna Marie Meurer had been employed as a maid in the Paulson home during the lifetime of Florence B. Paulson and assisted in her care through her last illness which extended over a period of months. She did not testify to any conversations with testatrix in regard to plaintiff but her testimony detailed in general the eccentricities of testatrix to which reference has already been made. She said that on one occasion, during the mother's last illness, plaintiff came to the home to see her mother and that testatrix refused her admission to the mother's room. The witness could not see that there was any reason arising out of the mother's physical condition which forbid plaintiff visiting with her. Her evidence was that testatrix never exhibited any affection for plaintiff and, in fact, she did not like to have plaintiff visit the mother. She testified that testatrix quarreled with persons who had been employed to labor about the home and that sometimes the

quarrel was as to the amount of their compensation. She detailed the outbursts of anger and characterized testatrix's conduct generally as cranky and old maidish, and said that she had more cranky spells than good natured ones.

George S. Jackman, Jr., testified that he attended his grandmother Paulson's funeral, that he saw his mother place a small bouquet of flowers in the mother's casket and that when Louise observed them she snatched them away with the remark, "Oh, how terrible!" He also testified to the resentment testatrix showed his mother at Norman's funeral when his mother tried to offer her comfort and sympathy. He said that testatrix became hysterical and weak during the funeral and had to be assisted about. On the other hand, the evidence indicates that plaintiff was gentle, kind, even tempered and thoughtful of her sister and tried to do things for her comfort. Her acts of kindness were either repulsed or little appreciated on the part of testatrix. There is no evidence that plaintiff acted in a revengeful spirit or retaliated with resentment such as she had often received from testatrix.

It appears that plaintiff and George S. Jackman were married in 1917, that he was engaged in business which later proved unsuccessful. About 1921 he was insolvent and Florence B. Paulson was called upon to pay certain notes which she had signed with her son-in-law George S. Jackman. The loss was approximately $7000. William W. North, the husband of Elizabeth, and the father of the principal beneficiary, Florence N. Kaspar, also signed some notes which he was required to pay to the amount of about $12,000. On November 16, 1921, Florence B. Paulson made her will in which she adopted a general scheme of dividing her property into four shares. She gave plaintiff the income of one of said shares with remainder to plaintiff's children, subject, however, that such share stand the losses she and William W. North had sustained on account of the Jackman notes. After her death in 1939, the will

was admitted to probate and it and the two codicils attached were the subject of construction in *Jackman* v. *Kasper,* 393 Ill. 496.

It appears from the will of Florence B. Paulson that plaintiff was entitled to a legacy of $2000 from her grandmother's estate which she never received and provision is made in the will whereby plaintiff was to have credit for that amount on the George S. Jackman indebtedness. In plaintiff's letter written to her nephew prior to the time of her mother's death, she stated that she was in financial distress and asked him to see if he could arrange to have the mother pay her the remainder of the $2000 at this time so she "could feel some security in this precarious life I am mixed up in. Louise and Norman and Elsa were paid in full and I was evidently thought incompetent." It also appeared in the same letter that plaintiff's mother had sent her money rather regularly. In one particular month there had been a deduction of $5 from the regular payment of $30, and in plaintiff's letter reference was made to such deduction and to a paper purportedly signed by the mother. Plaintiff said: "What do you think of the signature. I'll bet Mater knows nothing about it." Warren's reply indicates that he had investigated the matter and found that the signature to the receipt was the genuine signature of Florence B. Paulson.

Plaintiff called two expert witnesses, James N. McFadden and Robert E. Britt, who were physicians specializing in mental and nervous diseases. They practiced their profession in St. Louis, Missouri, and each had wide experience and had received high honors in their professional field. They had never seen testatrix and based the opinions they expressed on the facts contained in the hypothetical question. The object at this time being to ascertain whether there is any evidence tending to support plaintiff's charge of mental incompetency, we will analyze the questions propounded to the experts and their answers

thereto to ascertain whether the opinions tend in any way to prove the allegation of mental incompetency. After assuming the facts stated in the question to be true, each expert was asked if he had an opinion as to whether testatrix's hatred of her sister had any effect on her mind in the making of her will. The answer of Dr. McFadden was that in his opinion the hatred testatrix had "would influence her in her decision against her sister when it came to the making of her will." He stated further that she evidenced such a hatred when she specified in the will that she was leaving her sister nothing. Dr. Britt's opinion was that the dislike for the sister influenced testatrix in the making of her will and he stated that, assuming the facts were correct, "I would say that at the time she made her will she excluded her sister under the influence of a delusion at that time."

The theory on which plaintiff was presenting the case was that testatrix lacked the mental capacity necessary to make a will, and that such mental deficiency was evidenced by her false beliefs in regard to plaintiff. The first question, and one on which expert opinion was admissible, was as to whether the facts stated in the hypothetical question indicated from a scientific point of view that testatrix was suffering from an insane delusion in regard to plaintiff. Such a question called for the application of scientific knowledge and the skill of the expert, but when plaintiff asked an opinion as to whether testatrix's hatred of her sister had any effect on her mind in the making of the will, she bypassed the primary question and ignored the necessity of making such proof. It might have been that her dislike for her sister influenced her in the making of the will but if such prejudice could be accounted for on any other ground than an insane delusion, she was not disqualified from making a will; so, when the experts said that in their opinion testatrix was influenced by reason of her dislike of plaintiff, they have not added any evidence

to support the question of mental incompetency and insane delusion.

The law is that a prejudice or dislike that a testator or testatrix might have for a relative is not ground for setting aside a will unless such prejudice and dislike can not be explained on any other ground than that of an insane delusion. *Blackhurst* v. *James,* 293 Ill. 11; *Carnahan* v. *Hamilton,* 265 Ill. 508.

The testimony of Dr. Britt was substantially the same as that of Dr. McFadden, but in stating his reason for his opinion he included the element that testatrix excluded her sister because of the influence of a delusion. Conceding that all the evidence was incorporated into the hypothetical question, we hold, as will be hereinafter noted, that it does not tend to support the charge that testatrix suffered from an insane delusion in regard to plaintiff. The standard or test to be applied in determining whether the facts tend to prove an insane delusion within the meaning of the law is a question for the court, and, holding as we do that the conceded facts do not prove an insane delusion, the opinion of Dr. Britt to the contrary, based upon the same facts, has little or no weight, and in the absence of any other evidence would not warrant the court in refusing to direct a verdict sustaining the will. *Owen* v. *Crumbaugh,* 228 Ill. 380.

In *Scott* v. *Scott,* 212 Ill. 597, it was said that "An insane delusion is a belief in something impossible in the nature of things, or impossible under the circumstances surrounding the afflicted individual, and which refuses to yield either to evidence or reason." It has also been said that an insane delusion is a belief in a state or condition of things which no rational person would believe. (*Snell* v. *Weldon,* 243 Ill. 496; *Nicewander* v. *Nicewander,* 151 Ill. 156.) To prove an insane delusion the evidence must show that the belief of the testator was founded on a false premise. *Bauchens* v. *Davis,* 229 Ill. 557.

In *Owen* v. *Crumbaugh,* 228 Ill. 380, after setting forth various definitions of what constitutes an insane delusion, it was said: "Whatever form of words is chosen to express the legal meaning of an insane delusion, it is clear, under all the authorities, that it must be such an aberration as indicates an unsound or deranged condition of the mental faculties as distinguished from a mere belief in the existence or non-existence of certain supposed facts or phenomena based upon some sort of evidence. A belief which results from a process of reasoning from evidence, however imperfect the process may be or illogical the conclusion, is not an insane delusion. An insane delusion is not established when the court is able to understand how a person situated as the testator was, might have believed all that the evidence shows that he did believe and still have been in full possession of his senses. Thus, where the testator has actual grounds for the suspicion of the existence of something in which he believes, though in fact not well founded and disbelieved by others, the misapprehension of the fact is not a matter of delusion which will invalidate his will."

If plaintiff's cause of action rested solely on the supposition contained in the hypothetical question in regard to testatrix's belief that plaintiff had made false accusations against her, then it would be necessary to consider only the letter which plaintiff wrote William H. North in 1939, in which she expresses doubt as to whether the mother signed a certain paper. Although not clearly expressed, the inference to be drawn from the statement and others contained in the letter is that plaintiff suspected testatrix had signed the mother's name to the paper. In that letter she states that she writes her mother regularly but she doubts if she reads the letters. But it can not be said that testatrix's aversion to plaintiff rested solely on a belief that plaintiff had falsely accused her of a wrong. There is evidence which indicates that testatrix disliked

plaintiff because of the financial trouble her husband had caused the family. It will be recalled that Douglas Boyer testified that he told testatrix, in substance, that she should not visit the shortcomings of plaintiff's husband on plaintiff. This evidently referred to the losses the mother and William W. North had paid on account of the Jackman notes. Boyer testified that testatrix's answer to his remark was that she could not forget it. It is no answer to say that testatrix's belief was based on an erroneous conclusion as to who was to blame for the losses. They had been sustained and that constituted a fact on which testatrix could form a belief in regard to plaintiff's injustice toward her. Her judgment might have been wrong but she could have labored under that belief and still have been in full possession of her senses.

It is contended that the court erred in refusing to permit Douglas Boyer to express an opinion as to whether testatrix was of sound mind and memory on February 27, 1942. Although the witness had known testatrix many years, his testimony in regard to conversations with her was limited to the time of the funeral of Florence B. Paulson in 1939 and that of Norman Paulson in 1942. The court sustained the objections on the ground that the witness had not stated sufficient facts on which to form an opinion. The ruling was correct and, in addition, if he had stated an opinion favorable to plaintiff's cause of action, it would not, in view of the previous conclusions, be entitled to any weight. There was no error in sustaining the objection to the question propounded to Dr. McFadden. The question was in bad form and not within the issue on which the expert witness could testify.

On the day that plaintiff closed her evidence, Warren H. North as executor, and Florence N. Kaspar and other defendants who had answered, moved the court to exclude from the jury all evidence and to give the jury a written instruction to find the will in question was the last will and

testament of Louise B. Paulson, deceased. The matter was taken under advisement for three days, and on the reconvening of court the motion was granted and the written instruction read to the jury. The court thereupon stated to the jury that its verdict should be: "We the jury find the will in question is the last will and testament of Louise B. Paulson, deceased, and on order of court verdict is by the jury returned accordingly and the clerk will so enter it. The jury is discharged."

Plaintiff contends that no verdict was returned and refers to statutory provisions and cases, all of which relate to the returning of a verdict where a cause is submitted to a jury on the merits. The sections of the statute in cases cited have no application in this character of case. In *Kinser* v. *Calumet Fire Clay Co.* 165 Ill. 505, it was contended that it was error to refuse a party the right to have the jury polled after it had obeyed a peremptory instruction in giving a directed verdict. It was said: "The peremptory instruction to find for the plaintiff was, in effect, taking the case from the jury. When the court directs a verdict an issue of law is raised upon the whole case, and there is no fact for the jury to find. To poll a jury upon the rendering of such a verdict would be an idle ceremony, resulting in no possible benefit to anyone." The principle announced in that case is controlling here. The giving of the peremptory instruction took the case from the jury and the record before us is sufficient to show that fact. The formal return of a verdict by the jury would not add anything to the record already made.

The circuit court of Will County had jurisdiction of the parties and subject matter, but plaintiff contends the court was in vacation when the decree appealed from was signed by the chancellor. It is urged that this circumstance and the further fact that when the chancellor signed the decree he was in another county renders it void. The record discloses that the peremptory instruction was given and the

jury excused from further service in the case on September 24, 1945. On that date the chancellor directed the clerk to make certain minutes which among other things included the granting of a motion for a directed verdict, the giving of the peremptory instruction and the form of verdict ordered to be returned. The minutes also show that on such verdict it was decreed that the will in question was the last will and testament of Louise B. Paulson, deceased. Then followed the notation, "See decree." The decree referred to was not signed on that date but was signed four days later in the judge's chambers in the city of Kankakee, in Kankakee County. The latter county and Will County are both included in the twelfth judicial circuit and the chancellor who signed the decree was one of the judges of that circuit.

The practice in this State is that in ordinary judgments, entered in actions at law, the clerk writes the record, but in decrees fixing the rights of parties in giving relief in chancery, the solicitor who represents the party in whose favor the decision has been made, writes the decree and, when approved by the chancellor, it is recorded. It has never been the practice or regarded as the duty of the clerk to draw decrees in chancery but only to record them when drawn by the solicitor in whose favor the decree has been pronounced and approved by the chancellor. The chancellor's approval is authority to the clerk to enter the decree of record. *Horn* v. *Horn,* 234 Ill. 268; *Hughs* v. *Washington,* 65 Ill. 245; *Schneider* v. *Seibert,* 50 Ill. 284; *Stevens* v. *Coffeen,* 39 Ill. 148.

The rights of the parties may be determined and pronounced by the court but such determinations do not become final until a decree embodying them has been approved by the chancellor. Until there has been such approval, the judge's conclusions and decision are subject to change or modification. (*Horn* v. *Horn,* 234 Ill. 268.) It is not essential to the validity of a decree that it be

signed by the chancellor. (*Horn* v. *Horn*, 234 Ill. 268; *Dunning* v. *Dunning*, 37 Ill. 306.) The chancellor's signature attached to the decree may be accepted by the clerk as his authority to enter the decree of record and when it is so entered it imports verity. In this case, the minutes entered by the clerk under the chancellor's direction show that the rights of the parties were determined on September 24, but in the light of the decisions cited such entries did not become a final determination of the matter until the decree had been approved by the chancellor.

Prior to 1933 the statute of this State authorized a judge to adjourn a term of court to court in course, in which event the judge was powerless to reconvene the court at any time before the first day of the next succeeding term. During the time that intervened between the day of adjournment and the first day of the next term, the court was regarded as in vacation. The powers which the judge could exercise during such vacation were those which were conferred by statute. For enumeration of such powers, see section 32 of the law relating to circuit courts. (Smith-Hurd Stat. 1927, chap. 37, sec. 32, par. 103.) When the Civil Practice Act was adopted in 1933, many of the statutes were amended to bring the subject matter of such act within the new practice act. At that · time section 24 of the act to revise the law relating to circuit courts (Ill. Rev. Stat. 1945, chap. 37, sec. 24, par. 72.24) became law. It provides that: "Each term in each of such courts [circuit and superior] shall continue until the first day of the succeeding term but the several courts may adjourn and reconvene from time to time in their discretion during the term." The second paragraph of said section, as amended in 1941, provides that whenever any such court stands adjourned during the term, the judge thereof may reconvene such court and proceed to dispose of any judicial business, including the trial or hearing of any cause or matter. It is obvious that, by these changes

in the law, the legislature intended to place it beyond the power of a judge to adjourn a term of court so that it could not be reconvened before the next succeeding term. Further evidence of such intent is found in the fact that the section prescribing the powers of a judge in vacation were omitted in the present act.

Some of the cases cited contain statements relative to the power of a judge when the court is in vacation but such decisions were based upon the former statute at a time when an adjournment of a term of court to court in course made it impossible to reconvene it for any purpose before the first day of the succeeding term. Under the present statute the circuit court of Will County might have been adjourned to a later date but it was beyond the power of the judge to adjourn it under circumstances which prevailed under the prior statute.

It is well settled that courts can exercise judicial functions only at the places fixed by law but the approval which the chancellor gave the decree in this case by indicating his approval in Kankakee was not the exercise of a judicial function. The rights of the parties had been determined during the session of court in Will County on September 24, and at the time of the presentation of the decree in Kankakee the chancellor did not undertake to modify or alter the terms of his previous findings and determinations. The only action taken was to give the decree his approval by signing his name thereto.

The judge's minutes on his docket have always been held sufficient to authorize an entry of a judgment *nunc pro tunc*. As already observed, the decree was noted on the minutes of September 24. The decree, although signed on September 28, is dated September 24 and was filed by the clerk on September 24. Under such circumstances the decree was properly signed.

There were two minors in this case and a guardian *ad litem* was appointed for each of them. At the conclu-

sion of the case the court fixed the compensation of one at $257, and the other at $200, and directed that such fees be taxed as costs in the case, and ordered that all costs be taxed against the plaintiff. Thereafter, plaintiff moved that all the costs be taxed against the estate of Louise B. Paulson, or in the alternative that they be apportioned equitably among the respective parties. On consideration of the motion, the court retaxed the guardian *ad litem* fees and ordered that one half of said fees be assessed against the plaintiff and the remaining one-half against the estate of Louise B. Paulson, to be paid in due course of administration. Section 6 of the Chancery Act (Ill. Rev. Stat. 1945, chap. 22, par. 6,) provides that one appointed as a guardian *ad litem* shall be allowed a reasonable sum for his charges, to be fixed by the court and taxed in the bill of costs. We find no irregularity in the taxing of the costs nor any abuse of discretion in apportioning the same between plaintiff and the estate.

The decree was correct and is affirmed.

*Decree affirmed.*