In re ESTATE OF ARMIDA L. BONJEAN, Deceased.—(ALICE SVENDSEN et al., Plaintiffs-Appellees, v. THE HERGET NATIONAL BANK OF PEKIN, Ex'r of the Will of Armida L. Bonjean, Deceased, et al., Defendant-Appellant.)

Third District    No. 80-36

Opinion filed November 26, 1980.—Rehearing denied December 29, 1980.

Thomas M. Atherton, of Frings, Bagley, Atherton & Clark, of Pekin, for appellants.

Harold H. Kuhfuss and Thad Kuhfuss, both of Kuhfuss & Kuhfuss, of Pekin, for appellees.

Mr. JUSTICE SCOTT delivered the opinion of the court:

At the time of her death, Armida L. Bonjean was a very troubled woman. She left surviving her two sisters, Alice Svendsen and Ann Puhal, and one brother, Gentile Ghidina, and the nephew of a predeceased brother, Mark Ghidina. She also left a will executed on December 30, 1976, which has been admitted to probate in the Circuit Court of Peoria County and which provides the basis for this dispute. The will bequeaths the majority of her property to Mark Ghidina, to Norma Craig, her deceased husband's sister, and to Josephine Massa and Ettore Serangeli, Mrs. Craig's children. Her living sisters and brother were specifically disinherited. The sisters and brother filed a petition in the circuit court below which alleges that Mrs. Bonjean was subject to insane delusions at the time her will was executed and she was therefore lacking testamentary capacity. After hearings on the petition the court below concluded that the testatrix suffered "* * * insane delusions which arose over her misunderstanding of her family's effort to assist her in her own mental condition * * *." As a consequence, that same court voided the will. This appeal was prosecuted seeking our review.

The Probate Act provides that "[e]very person who has attained the age of 18 years and is of sound mind and memory has power to bequeath by will the real and personal estate which he has at the time of his death." (Ill. Rev. Stat. 1977, ch. 110½, par. 4—1.) Interpreting the "sound mind and memory" requirement of section 4—1 and its predecessor sections, the courts have held that:

> "Testamentary capacity requires sufficient mental ability to know and remember who are the natural objects of [one's] bounty, to comprehend the kind and character of [one's] property and to make disposition of the property according to some plan formed in [one's] mind. (*Quellmalz v. First National Bank* (1959), 16 Ill. 2d 546, 158 N.E.2d 591; *Morecraft v. Felgenhauer* (1931), 346 Ill. 415, 178 N.E. 877.) Deliberate disinheritance of an heir does not establish inability to know the natural objects of testator's bounty." (*Beyers v. Billingsley* (1977), 54 Ill. App. 3d 427, 437-38, 369 N.E.2d 1320, 1328.)

It was not argued below, nor is it argued here, that the testatrix failed to meet the test set forth in the *Beyers* case. However, the petitioners point to a narrow objection to testamentary capacity which can be sustained where the testatrix knows the objects of her bounty but suffers from insane delusions regarding those objects.

■■ The court decisions which discuss the effect of insane delusions on

testamentary capacity are accurately synthesized in a published treatise:

"An insane delusion may render a will invalid if it can be shown that the will was a product of, or influenced by, the delusion. While it is difficult to define 'insane delusion,' the supreme court has held it to be present where a testator, without evidence of any kind, imagines or conceives something to exist which does not exist in fact, and which no rational person would, in the absence of evidence, believe to exist * * *.

The insane delusion must affect the will or enter into its execution. Even if the testator has an insane delusion on a particular subject, if the property and objects of bounty are known by the testator, and the property is disposed of according to a plan, the will will not be set aside for lack of testamentary capacity." (3 Horner, Probate Practice and Estates §1384, at 2930 (4th ed. 1979).)

An insane delusion is an irrational belief. Where a testatrix has some actual grounds for the belief which she has, though regarded by others as wholly insufficient, the mere misapprehension of the facts or unreasonable and extravagant conclusions drawn therefrom do not establish the existence of such a delusion as will invalidate her will. *Snell v. Weldon* (1910), 243 Ill. 496, 90 N.E. 1061.

■■■ The law presumes every man to be sane and of sound mind until the contrary is proved, with the burden resting upon the party who asserts it to prove lack of testamentary capacity. (*Sloger v. Sloger* (1962), 26 Ill. 2d 366, 186 N.E.2d 288.) Consistent with that presumption, the petitioners here had the burden of proving that Mrs. Bonjean's disinheritance of her sisters and brother was the result of an irrational belief. If that act of disinheritance, whether motivated by prejudice, dislike, or even hatred, can be explained on any rational ground, then the burden of proof necessary to set aside the will has not been met. (*Jackman v. North* (1947), 398 Ill. 90, 75 N.E.2d 324.) Testamentary capacity is not denied even if the testatrix dislikes and disinherits her family for bad reasons so long as the bad reasons have a rational foundation. *In re Estate of Stuhlfauth* (1980), 88 Ill. App. 3d 974, 410 N.E.2d 1063; *Estate of Carpenter v. Bailey* (1892), 94 Cal. 406, 29 P. 1101.

As we noted at the outset, Armida L. Bonjean was a troubled woman, but we do not believe that her testamentary rebuff of the petitioners, her sisters and brother, defies rational explanation.

The glimpses of Mrs. Bonjean's life as recounted by the record on appeal etch a portrait of human tragedy. The testatrix was unhappily married for 19 years to Americo Bonjean, and both parties had from time to time separated and contemplated divorce. Mrs. Bonjean sought treatment at the George A. Zeller Zone Center for "involutional melan-

cholia" during part of 1969. Reconciled with her husband by October 26, 1971, the spouses argued with each other and Mrs. Bonjean left the apartment with her husband threatening to take his own life as she fled. She later returned to discover he had carried out his threat. Later that same year and twice in 1972 Mrs. Bonjean voluntarily entered the Zeller Center afflicted with severe guilt, grief and depression. She blamed herself for her husband's death.

On July 14, 1972, the testatrix was found comatose in her Springfield apartment. She had attempted suicide by taking drugs and placing a plastic bag over her head. This was not the first occasion, nor would it be the last, when Mrs. Bonjean would attempt to take her own life. Indeed, just a year later on July 17, 1973, the testatrix was admitted to Zeller Center after her attempt at suicide by jumping off the Murray-Baker Bridge in Peoria. She was treated for depressive neurosis as an in-patient until October 15, 1973, when she was released to out-patient status.

After her release from in-patient care, Mrs. Bonjean became increasingly antagonistic toward family members. This antagonism caused the three petitioners to meet and to decide to have the decedent involuntarily committed. This attempt at involuntary commitment caused Mrs. Bonjean to be examined on January 9, 1974, by Dr. P. J. Perkins, who found she had "no psychosis," had "no combativeness," "was oriented," and "was not certifiable." She was released for continued out-patient counselling, and to that end she met with Dr. Ismail Tolek the next day. Contemporaneously, Dr. Tolek wrote to the circuit court in which the commitment proceeding was pending, stating that:

> "During our contacts with Mrs. Bonjean in the past it has come to our attention that a longstanding conflict has existed between her and family members. Most recently it appears though that they have threatened to use her background of previous hospitalizations in mental facilities to force her commitment to an institution at this time, which provokes the client to the extent of relating hostility and resentment to those individuals by phone and by letters; and they in turn use this against her for involuntary commitment with our system.
>
> * * * It appears that the petitioner's tendency to indulge in the client's personal affairs has quite a disturbing effect on the emotional well-being of the client. I feel that I should bring this to your Court's attention for any additional legal matters being taken to avoid further harrassment of this client."

Petitioners testified that they sought to place Mrs. Bonjean in Zeller Center for her own health and safety, strictly altruistic motives, but that the decedent interpreted their actions as unkind and unfair.

In March of 1975 the testatrix was hired to run the gift shop at the

Greater Peoria Airport. Until she terminated her employment for health reasons in November 1977, the decedent performed her employment in a satisfactory manner, accepting considerable responsibility and maintaining an excellent relationship with her co-workers. During this time Mrs. Bonjean spoke infrequently, if at all, of her sisters and brother, making little contact with them. This was in sharp contrast to the warm and cordial relationship among the siblings prior to 1973.

During this same period of time the testatrix wrote to public officials with letters which carried two main themes. First, the letters defended the right of an individual to take his own life as long as the individual is not psychotic or a danger to others. Second, the letters expressed the concern that the method for involuntary commitment provided for in the Mental Health Code permitted family members to intimidate one another with the threat of commitment.

On December 5, 1977, Mrs. Bonjean died at the age of 64 from ingestion of cyanide.

The petitioners argue, and we quote from their brief, that the testatrix "could not rationally turn against her sisters and brother who did nothing to her but try to help her." We disagree with that conclusion and believe the decision reached below is inconsistent with the uncontradicted evidence.

■■ The act of suicide, or attempted suicide, is not, *per se*, proof of insanity or insane delusions. (*Wilkinson v. Service* (1911), 249 Ill. 146, 94 N.E. 50; *In re Lingenfelter's Estate* (1952), 38 Cal. 2d 571, 241 P.2d 990; *In re Rein's Estate* (1946), 139 N.J. Eq. 122, 50 A.2d 380.) Suicide may, however, be part of a pattern of behavior which eludes rational explanation. (*Wilkinson v. Service.*) The actions of the testatrix in the case at bar do not defy rational explanation. The petitioners concede that although their actions toward the decedent were prompted by altruistic concerns, those actions were not always received or interpreted in the same spirit. We believe Mrs. Bonjean's resentment of her family's attempt to force her commitment provides a rational explanation for their disinheritance. The trial court found that the testatrix misunderstood her family's effort to assist her in her own mental condition. Yet, "the mere misapprehension of the facts" does not establish the existence of such a delusion as will invalidate a will. *Snell v. Weldon.*

■■ We find that the facts which fostered Mrs. Bonjean's hostility toward her sisters and brother have a rational basis. The hostility is not the product of a "perverted imagination." (*Snell v. Weldon.*) Mrs. Bonjean's hostility toward her family can be rationally explained as deriving from a threat to her personal liberty associated with those same family members. Because this rational explanation appears uncontradicted in the record,

the burden of proof necessary to set aside the will has not been met. *Jackman v. North* (1947), 398 Ill. 90, 75 N.E.2d 324.

■■ Finally, the notice of appeal filed herein designated the will's executor, Herget National Bank, as an appellant. The legatees under the will who were defendants below were not expressly named as appellants in the notice but were included by the designation "*et al.*" The petitioners argue that this designation is insufficient and that the individual legatees are not party to this appeal. While the imprecision of the designation "*et al.*" should not be encouraged as the method of enumerating appellants in the statutory notice, under these circumstances we hold that such a procedure is sufficient. We note that the signature of each appellant's attorney appears on the notice (see Ill. Rev. Stat. 1979, ch. 110A, par. 303(c)(3)), as all appellants including the executor are represented by the same counsel.

The decision of the court below is reversed as to all appellants and the cause remanded to the Circuit Court of Peoria County for proceedings not inconsistent with the views expressed herein.

*Reversed and remanded.*

BARRY and STOUDER, JJ., concur.